1  Richard H. Poulson (SBN: 178479)
   LAW OFFICE OF RICHARD H. POULSON
2  The Mansard Building
   2233 Santa Clara Avenue, Suite 3
3  Alameda, California  94501
   Telephone:     (510) 747-8034
4  E-mail:        rich@richardpoulsonlaw.com

5  Attorneys for Defendant
   SAMEER PADHYE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| NATIONAL SPECIALTY PHARMACY, LLC, | Case No.: 5:23-CV-4357-NW |
|---|---|
| Plaintiff, | **DEFENDANT SAMEER PADHYE'S NOTICE OF MOTION AND MOTION PURSUANT TO 28 U.S.C. § 1927 FOR SANCTIONS** |
| v. | |
| SAMEER PADHYE, | TIME:      September 3,2025<br>DATE:      9:00 A.M.<br>LOCATION:  Courtroom 3<br>           5TH FLOOR<br>           U.S. DISTRICT COURT<br>           SAN JOSE, CALIFORNIA |
| Defendant. | |
| | Trial Date:   September 15, 2025 |

- 1 -
**DEFENDANT SAMEER PADHYES'S MOTION PURSUANT TO 28 U.S.C. § 1927**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT, on September 3, 2025 at 9:00 a.m. or as soon as may be heard thereafter, at 280 First Street Courtroom 3, San Jose, California, pursuant to Rules 7-2 and 7-8 of the Civil Local Rules of the Northern District of California, Defendant Sameer Padhye ("Defendant"), by and through his counsel of record, hereby moves this Court for an order pursuant to 28 U.S.C. § 1927 for fees against NSP's counsel, Nitoj P. Singh, seeking an award of fees and costs for vexatiously and prolonging this proceeding from the filing of the Second Amended Complaint.

This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, and the supporting Declaration of Richard H. Poulson, as well as all pleadings, papers, and other documentary material in the Court's file for this action, those matters of which this Court may or must take judicial notice, and such other matters the Court may consider.

DATED: June 9, 2025

LAW OFFICE OF RICHARD H. POULSON

By:  /s/ Richard H. Poulson
    RICHARD H. POULSON
    Attorney for Defendant
    SAMEER PADHYE

**TABLE OF CONTENTS**

I.   RELEVANT BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A.   The parties' early relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    B.   Padhye's work at NSP and change in the White Card program. . . . . . . . . . . . . . . . . 6
    C.   Padhye sends e-mails to himself . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
    D.   Padhye leaves NSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    E.   Padhye's access of Monday.com . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    F.   Current status of NSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
    G.   Litigation conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . 8
    H.   Issue of sanctions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
II.  MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . .9
    A.   An attorney's obligations and duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
         1.   Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
         2.   Breach of contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
         3.   Unfair Business Practices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
         4.   Tortious interference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
         5    Trade Secrets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

III. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

# TABLE OF AUTHORITIES

**CASES**

*AMN Healthcare, Inc. v. Aya Heathcare Services, Inc.* 28 Cal.App.5th 923 (2018) . . . . . . . . . . . . . 12

*Christianson v. Matte, Inc.* 286 F.3d 1118, 1127 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*InteliClear, LLC v. Global Holdings, Inc.* 98 F.3d 653, 657-58 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . 11

*Ixchel Parmar, LLC v. Biogen, Inc.* (2020) 9 Cal. 5th 1130. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Keegan Management Co., Securities Litigation*, 78 F.3d 431 (9th Cir. 1996). . . . . . . . . . . . . . . . 9

*Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 320 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Quelimane Co. v. Stewart Title Guar. Co.* (1998) 19 Cal. 4th 26, 55 . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Service by Medallion, Inc. v. Clorox Co*. (1996) 44 Cal. App. 4th 1807 . . . . . . . . . . . . . . . . . . . . . . . .11

**STATUTES AND RULES**

18 U.S.C. § 1836 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1927 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Fed.R.Civ. P. 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

California Business and Professions Code § 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

## I. RELEVANT BACKGROUND.

### A. The parties' early relationship.

Defendant Sameer Padhye ("Padhye") first met Sanjiv Dhawan ("Dhawan"), an attorney and the future founder of Plaintiff National Specialty Pharmacy, LLC ("NSP") in 2015 when Padhye hired Dhawan as outside counsel for FixStream, a company Padhye founded. (Declaration of Richard H. Poulson in Support of Motion Pursuant to 28 U.S.C. § 1927 ("RHP Dec."), Exh. A at pp. 18:2-12, 17-20; Exh. B at 11:3-10.) For the next several years, Dhawan and his firm provided legal services for FixStream until it was sold in 2019. (Exh. B at 11:3-10; 11:16-20.)

In 2022, while Padhye was the CEO of Enlil, Inc. (a software company for medical device certifications), Dhawan approached him with an opportunity to work for NSP. (Exh. A at p. 15:18-21; Exh. B at 12:18-21). NSP was a compounding pharmacy that focused on patients holding U.S. Department of Labor, Division of Energy Employees Occupational Illness Compensation, Pharmacy Benes Cards (a/k/a "White Cards") which was part of the White Card program: ("WCP"). (Dkt. No. 83 at ¶ 16.) NSP would provide prescriptions to White Card holders and be reimbursed at a higher rate by the government. At that time, the WCP accounted for approximately 90% of NSP's revenue. and Dhawan was interested in growing the business to other geographic locations and sought Padhye's assistance in doing so.

During the interview process, Padhye provided NSP with his resume and a description of his relevant work background (which notably did not include any pharmaceutical or medical experience.). (Exh. C at pp. 47:8-22, 35; 46:1-8; Exh. 4) Dhawan noted Padhye's lack of experience in the pharmaceutical experience specifically. (Exh. C. at Exh 2.) Nevertheless, Dhawan was interested in scaling the business and Padhye's work at CISCO accounted for 70% of the reasons he wanted Padhye for the position, with his "medical industry experience" accounting for 20% and 10% for his overall management skills. (Exh. C at pp. 32:9-22; 34:22-35:15.) To investigate Padhye's background, Dhawan looked at Enlil's website (although he was aware that Enlil was not a pharmaceutical business), spoke with Padhye, and reviewed at his resume, but nothing else. (Exh. C at pp. 37:11-16-18; 44:3-4; 7-12, 16-25; 46:1.) And while NSP admits that Padhye did not have any pharmaceutical experience, it hired him, nonetheless. (Exh. B at pp. 39:5; 8-10; 40:20-25; 41:1-5.)

1  B.      **Padhye's work at NSP and change in the White Card program.**

2      In October 2022, Padhye began work for NSP. (Exh. A at p. at 27:19-21.) NSP claims it then

3  discovered for the first time in February 2023 that Padhye did not have the pharmaceutical experience

4  it wanted for that position but it chose not to terminate him at that point. (Exh. C at pp. 37:25-38:24).

5  In fact, despite knowing about this particular lack of experience (and later filing a lawsuit claiming

6  damages from this alleged fraud), NSP awarded Padhye a bonus and increased his salary the next

7  month in March 2023. (Exh. C. at pp. 42:20-25; 43:1-8; 46:10-23, Exh. 3.)

8      In mid-2023, there was a change in the White Card Program limiting the margins NSP was able

9  to charge for prescriptions and thus drastically decreasing its revenues by September 2023. (Exh. C at

10 pp. 18-25: 100:1-2; 101:23-25; 102: 1-5). As the White Program accounted for the vast majority of

11 NSP's revenue in June 2023, by NSP's own admission, the changes to the White Card program

12 resulted in an <u>80%-90% drop</u> in revenue for NSP by September of that year and rendered NSP unable

13 to sustain its operations. (Exh. D at pp. 278:9-279:8; 279:12-25; 280:1-4; 282:1-8; 282:22-25.) Its

14 non-White Card business, however, was about 10-15% of its revenue in July 2023 and remained steady

15 until it started to increase in August and September 2023. (*Id.* at pp. 280:12-24; 281:12-14.)

16 C.      **Padhye sends e-mails to himself.**

17     On June 21, 2023, while still employed at NSP, Padhye sent himself a series of e-mails from

18 his NSP e-mail address to his personal Gmail address as he did not have a work computer to use and

19 wanted access to those e-mails. (Exh. A at p. 107:23-108:2). NSP claims that those e-mails contained

20 its trade secrets and constituted misappropriation for which it seeks relief in this action[1] even though 1)

21 Padhye was an employee and authorized to have the information[2]; 2) there was no evidence that he

22 forwarded the information to anyone[3], 3) NSP is unaware of any use of this information beyond

---

[1] Exh C at pp. 121:16-21; 127:12-23; 131:9-11; 1-20; 24-25; 137:9-23; 142:23-143:10;146:7-16;147:19-25; 150:13-25; 155:115:156:8; 160:11-161:6;170:3-19; 172:6-15; 173:18-174:4; 198:24-199:8; 203:1-6.

[2] Exh. C at pp. 122:27; 128: 7-9;132:23-133:20; 143:13-17; 151:16-20; 158:3-4; 166:4-20; 175:5-6);

[3] Exh. C at pp. 122:8-13; 127: 24-128:1; 132: 7-11; 159:17-20)

**DEFENDANT SAMEER PADHYES'S MOTION PURSUANT TO 28 U.S.C. § 1927**

emailing it to himself,[4] and 5) that there is no evidence of damages[5]. In fact, NSP has no evidence of anyone benefiting at all from this alleged misappropriation. (Exh. C. at p. 288:22-25) and NSP admits it is unaware of Padhye disclosing any of its trade secrets to a third party. (Exh. C at p. 79:24-80:1).

**D.    Padhye leaves NSP.**

While the specific terms are disputed, Padhye left NSP's employment in June 2023 after NSP stopped paying for his insurance. (Exh. A at 47:23-25; 48:1-8; 11-25; 49:1-6, 15-25.) After his departure, Padhye flirted with the idea of entering the remote-patient care morning with an entity he created, Taycann Wellness ("Taycann.") (Exh. A at p. 57:7-9.) Taycann however, never made money and never pursued any White Card program business (*id*. at pp. 61:21-22; 62:11-17.)

NSP admits that there was no prohibition from Padhye entering the pharmacy business or White Card Program business (Exh. C at 80:9-18); that it has no evidence that Taycann made any money at all (*id*. at p. 248:7-17); that it has no evidence that it was authorized to participate in the White Card program (*id*. at 248:18-20; 292:12-15); that it is unaware if NSP lost any money due to the operation of Taycann (*id*. at 249:2-6); that it does not know if Taycann affected NSP's business at all. (*id*. at 260:9-15); and that it has no evidence of clients, providers, or patients lost to Taycann Wellness. (*id*. at p. 285:12-14.)

**E.    Padhye's access of Monday.com.**

In July 2023, Padhye asked to be removed as the Administrator for NSP's Monday.com site. (Exh. C at 111:4-6; 11-13.) Hearing no response, he accessed the site and removed himself as the Administrator. (Exh. A at pp. 61:6-9; 14-20). NSP now claims that by accessing the site, Padhye simultaneously misappropriated its trade secrets (Exh. D at pp. 205:8-14; 210:210-211:21: 212:12-213:6; 217:22-218:2; 219:4-21; 220:4; 222:9-18; 225:25; 228:9-16; 229:21-230:16) although NSP couldn't confirm that these trade secrets was actually from the website (*id*. at pp. 205:21-206:7; 208:1-4317:3-9; 219:22-25); or whether these secrets were even actually reviewed by Padhye (*id*. at pp. 218:10-14; 220:1-7; 222:19-22); but that it believes the trade secrets were misappropriated simply by

---

[4] Exh. C at pp. 122:13-15; 128:2-4; 132:2-22; 140:13-15; 143:25-9; 146:17-147:3; 151:6-14; 153:18-22; 157:21-158:2; 170:2-171:1; 172:16-173:1; 174:5-11; 192:11-21; 197:10-15; 198:15-22; 203:24-204:6).

[5] Exh. C at pp. 133:23-13; 144:14-145:3; 147:4-15; 150:3-9; 159:23-160:10; 165:24-3; 171:2-7; 173:5-9; 174: 12-18: 192:22-193:9; 198:1-9; 199:23-200; 201:25-202:1; 204:7-13).

accessing it without evidence of him actually reviewing the data itself. (*id.* at pp. 206:17-207:25; 208:9-209:1; 228:15-24). In addition, NSP again lacks evidence of any misuse or damages from this alleged misappropriation. (*Id*. at pp. 209:12-210:6; 218:127-225; 220:9-14; 220:16-221:8; 227:10-21; 228:25-229:13; 230:17-23). Last, some of the trade secrets NSP claims Padhye misappropriated were historical marketing events, not trade secrets. (*Id*. at p. 225:3-25). In the end, NSP conceded it did not know if Padhye did anything on the Monday.com site after leaving NSP other than changing the Administrator. (Exh. D a p. 336:21-25.)

**F.    Current status of NSP.**

After initiating this litigation in August 2023, NSP sold its patient list to another pharmacy for $175,000 the next month. (Exh. C. at pp. 2:22-25; 13:1-4; 14:3-14.) NSP has not conducted business since October 2023 and is now just a shell with no employees and no plans to make it active. (Exh. B. at pp. 23:12-22; 25:9-10; 28:24-29:3).

**G.    Litigation conduct.**

The Court previously dismissed with leave to amend NSP's trade secrets claims for failing to sufficiently identify the trade secrets at issue. (Dkt. 82.) While NSP filed an amended complaint, its identification of the trade secrets remained vague and shifted time and time again. (*See* Exhs. E-H, Response to Interrogatory No. 1.) In fact, NSP did not identify the documents which it alleged contained these trade secrets until December 11, 2024, after the deposition of its corporate representative had already begun. (Exh. I.) Moreover, despite NSP's claims that it could not verify if there were people other than Padhye who had access to his Gmail account, NSP's counsel never asked him who had such access.

And while NSP also filed suit against other entities, specifically ColigoMed, Enlil (Padhye's former employer) and Arista Networks (Padhye's current employer), NSP was unable to identify any basis for including any of those companies without violating the attorney-client privilege, leaving it responsibility for naming those defendants in the hands of its counsel. (Exh. D at p. 288:4-10).

**xx.    Issue of sanctions.**

Padhye first raised the issue of a sanctions motion in an October 24, 2024 in a letter to NSP's counsel. (*See* Exh. J.) Singh responded but declined to abandon this litigation asserting that the

fraudulent misrepresentation concerned Padhye's "biopharmaceutical experience." (*See* Exh. K.) . Padhye's counsel e-mailed Singh on May 30, 2025 seeking to discuss this matter and called the next business day but did not receive a response. (RHP Dec. at ¶ 19.) Accordingly, this motion is filed as soon as practicable as after close of fact discovery was able to obtain the earliest hearing available to both counsel and the Court and filed before the commencement of expert discovery. (L.R. 7-8.). At the time of this filing, Padhye has incurred $38,356.16 in attorney's fees and expenses. (RHP Dec. at ¶ 20.)

## II.     MEMORANDUM OF POINTS AND AUTHORITIES

Padhye does not bring this motion lightly or as a mere litigation tactic but because the obvious and fatal flaws of NSP's claims should have been obvious to its counsel from the start. Time and time again, NSP admitted it did not have the requisite evidence to support its claims and ignored evidence that directly contradicted them, all while it's counsel (clearly aware of these flaws) nevertheless tried to justify them while dragging its heels on complying with discovery requests, identify the trade secrets at issue, producing documents, and the conducting of deposition in general. While counsel is given wide latitude to represent their clients zealously with the bounds of the law and rules of professional conduct, there are limits and rules that provide relief to those who incur expense as a result of the violations of those rules.

### A.     An attorney's obligations and duties.

An attorney has a duty to conduct a factual investigation prior to filing a complaint which is reasonable under all the circumstances of the case. (*Christianson v. Mattel, Inc*. 286 F.3d 1118, 1127 (9th Cir. 2002). That duty demands that, that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances that the action 1) is not presented for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; 2) the claims, defenses, and other legal contentions are warranted by law; 3) the allegations have evidentiary support; and 4) that denial of factual contentions are warranted on the evidence. (*See* Fed.R.Civ.P. 11.)

Moreover, "bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." (*In re Keegan*

1  *Management Co., Securities Litigation*, 78 F.3d 431 (9th Cir. 1996.)  Should an attorney not conduct the required due diligence or continue to prosecute a frivolous claim, he runs the risk of a Court holding him personally responsible for costs, expenses, and attorneys' fees reasonably incurred by an opposing party because of such conduct.  (28 U.S.C. § 1927.)

While § 1927 does not apply to initial pleadings, Nitoj P. Singh, NSP's current counsel and the subject of this motion ("Counsel") appeared in the Second Amended Complaint filed on June 3, 2024.  (Dkt. No. 83.)  After the completion of fact discovery, it became inescapably clear that counsel did not adhere to these standards but did so with the subjective bad faith sufficient to warrant sanctions personally.

### 1. Fraud.

"A complaint for fraud must allege the following elements: (1) a knowingly false representation by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages." (*Service by Medallion, Inc. v. Clorox Co*. (1996) 44 Cal.App.4th 1807, 1816.)  Here, NSP has at different times alleged that Padhye mispresented his pharmaceutical experience (Dkt. 83 at ¶ 75), his "biopharmaceutical experience, (Exh. K), as well as his experience in the "medical services" business.' (*See* Exh E at p . 6:25-26.)  At the same time, however, it admitted that it did not know what the "biopharmaceutical business" entailed.  (Exh. C at p. 28:6-20.)

Despite these morphing allegations, NSP admitted in its correspondence that it was aware of Padhye's lack of pharmaceutical experience and had his resume which did not indicate any and that, other reviewing the resume, resume, the website of his prior employer, and verbal discussions with Padhye, NSP did nothing to investigate his background.  Then, after discovering this alleged fraud, it chose to give him a raise and retain him as an employee.  There is no "knowingly false representation" here.  There was no reliance.  There was no damage.  There is no claim.  And these flaws were obvious to both NSP and its' counsel from the beginning.

### 2. Breach of contract.

NSP's claims for breach of contract are likewise frivolous.  First, this claim regarding alleged mishandling of confidential information is identical to its claims of misappropriation and fails due to

the same lack of damages. (Exh. D at pp. 233:3-19; 235:16-25.) Similarly, while it claims Padhye breached his contract by not signing a "a termination certification" or violated the "conflict-of-interest" certification (*id*. at p. 251:21-22) or by devoting sufficient time to his duties while at NSP (*id*. at p. 253:9-22), these claims are also without merit and no damages have been shown.

While NSP on one hand claims that Padhye's failure to develop alternative lines of business for NSP other than the WCP contributed 90% to NSP's failure but ignores its own admission of the devastating effect that the changes in the WCP margins had on the company. (Exh. D at p. 255:11-17.) And again, the fact that NSP admits that it wanted to retain Padhye as an employee negates their contractual claim that he was not fulfilling his duties to it. And again, these fatal flaws were obvious to both NSP and Counsel from the beginning.

### 3      Unfair Business Practices claim.

NSP also asserts a claim for Unfair Business Practices against Padhye pursuant to the California Bus. & Prof. Code §§ 17200, *et seq*. which prohibits, and provides civil remedies for, unfair competition, which it defines as "any unlawful, unfair or fraudulent business act or practice." (*Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 320 (2011). NSP confirmed that the predicate acts it claims support this cause of action are the same ones it claims support the others. (Exh. C at pp. 289:1-4, 19-290:3.) As a result, this claim fails for the same reasons as the others.

### 4.      Tortious interference claim.

To establish its claim of tortious interference, NSP must prove 1) a valid contract between it and a third party; 2) Padhye's knowledge of this contract; 3) his intentional acts designed to induce a breach or disruption for the contractual relationship; 4) actual breach or disruption of the contractual relationship; and 5) resulting damage." (*Quelimane Co. v. Stewart Title Guar. Co*., 19 Cal. 4th 26, 55 (1998) (international quotations omitted.) For "at-will" contracts such as the ones Padhye is alleged to have interfered with, courts require that the interference be independently wrongful, meaning that Padhye's conduct must be unlawful or outside the bounds of fair competition. (*Ixchel Phamra*, 33 Cal.4th at 1152) "Without an independent wrongfulness requirement, a competitor's good faith offer that causes a business to withdraw from an at-will contract could trigger liability or at least subject to competitor to costly ligation." (*Ixchel Parmar, LLC v. Biogen, Inc*. (2020) 9 Cal. 5th 1130, 1148.)

As a threshold matter, NSP admits it has no evidence of whether Padhye was aware of the contracts it claims he interfered with. (cite.) Moreover, the "wrongful act" on which NSP relies for this claim is the alleged violation of an employee non-solicitation clause which courts have found invalid. (*AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* 28 Cal.App. 5th 923 (2018) holding that an employee non-solicitation clause violated Bus. & Prof. Code § 16600.) .) Last, given its apportionment of the causes of its demise to the WCP and Padhye's alleged underperformance, there is no cognizable damage resulting from this alleged interference.

      5.    **Trade secrets claim**.

NSP further claims that NSP misappropriated its trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836. Such a claim requires that NSP prove 1) that it possessed a trade secret 2) that the defendant misappropriated; and(3) that the misappropriation caused or threatened damage. (*InteliClear, LLC v. ETC Global Holdings, Inc*. 98 F.3d 653, 657-58 (9th Cir. 2020). But the record is consistent in that NSP has no evidence of misappropriations, use, or resulting damage to sustain this claim.

### III.    CONCLUSION

One cannot acknowledge the evidentiary and legal failings of NSP's claims without recognizing the complicity of its counsel. While the emptiness of NSP's claims became readily apparent to Padhye after the close of fact discovery, NSP's counsel was aware of them from the start. And despite being confronted with these deficiencies numerous times, he continued to prosecute the action and took every opportunity to multiply and prolong the proceedings, and shift the sands on which this house of cards was built to force Padhye to incur additional and unnecessary costs in hopes of extracting an exorbitant settlement. Counsel's action crossed the bounds of zealous advocacy and dove headlong into the realm of sanctionable conduct.

WHEREFORE, for the reasons stated above and in the supporting papers, Defendant Sameer Padhye requests that this Court award him an amount sufficient to compensate him for the fees and costs he has had to incur since NSP's current counsel filed the operative complaint in this action.

**DEFENDANT SAMEER PADHYES'S MOTION PURSUANT TO 28 U.S.C. § 1927**

DATED: June 9, 2025

LAW OFFICE OF RICHARD H. POULSON

By: /s/ Richard H. Poulson
    RICHARD H. POULSON
    Attorney for Defendant
    SAMEER PADHYE

**DEFENDANT SAMEER PADHYES'S MOTION PURSUANT TO 28 U.S.C. § 1927**