# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                        --oOo--

 4   NATIONAL SPECIALTY PHARMACY,    )
     LLC,                            )
 5                                   )
                     Plaintiff,      )
 6                                   )
               vs.                   ) No. 5:23-CV-4357-PCP
 7                                   )
     SAMEER PADHYE, AN INDIVIDUAL;   )
 8   BENJAMIN D. BROWN, AN INDIVIDUAL;)
     AND DOES 1 TO 40, INCLUSIVE,    )
 9                                   )
                     Defendants.     )
10   _____)

11

12

13

14

15

16

17            DEPOSITION OF SAMEER PADHYE

18             SAN FRANCISCO, CALIFORNIA

19                 DECEMBER 6, 2024

20

21

22

23
     Reported by:
24   Catherine Buenaventura
     CSR NO. 8724
25   No. 1330894
```

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4  NATIONAL SPECIALTY PHARMACY,      )
   LLC,                              )
5                                    )
                   Plaintiff,        )
6                                    )
             vs.                     ) No. 5:23-CV-4357-PCP
7                                    )
   SAMEER PADHYE, AN INDIVIDUAL;     )
8  BENJAMIN D. BROWN, AN INDIVIDUAL; )
   AND DOES 1 TO 49, INCLUSIVE,      )
9                                    )
                   Defendants.       )
10 _____ )

11

12

13

14

15

16

17

18        DEPOSITION OF SAMEER PADHYE, a witness, herein,

19  taken on behalf of the Plaintiff, at 580 California

20  Street, 12th Floor, San Francisco, California, at

21  9:45 A.M., on Friday, December 6, 2024, before

22  Catherine Buenaventura, Certified Shorthand Reporter

23  No. 8724.

24

25

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4         DHILLON LAW GROUP, INC.
           BY:  NITOJ P. SINGH, ESQ.
 5         177 Post Street
           Suite 700
 6         San Francisco, California 94108
           Tel:  415.682.6831
 7         Email:  nsingh@dhillonlaw.com

 8

 9    FOR THE DEFENDANTS:

10         LAW OFFICE OF RICHARD H. POULSON
           BY:  RICHARD H. POULSON, ESQ.
11         2233 Santa Clara Avenue
           Suite 3
12         Alameda, California 94501
           Tel:  510.747.8034
13         Email:  rich@richardpoulsonlaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS:  SAMEER PADHYE

 3   EXAMINATION BY                            PAGE

 4   MR. SINGH                                    9

 5

 6            QUESTION MARKED BY MR. SINGH

 7   82/7, 110/13, 113/10, 114/15, 118/5, 143/22, 155/24

 8

 9                  E X H I B I T S

10   EXHIBIT                                    PAGE

11   EXHIBIT 1    SECOND AMENDED COMPLAINT        66

12   EXHIBIT 2    DEFENDANT SAMEER PADHYE'S ANSWER  67

13                TO THE SECOND AMENDED COMPLAINT

14   EXHIBIT 3    NATIONAL SPECIALTY PHARMACY, LLC  71

15                AT-WILL EMPLOYMENT, CONFIDENTIAL

16                INFORMATION AND INVENTION

17                ASSIGNMENT AGREEMENT

18   EXHIBIT 4    CONFLICT OF INTEREST CERTIFICATION  80

19   EXHIBIT 5    EMPLOYEE HANDBOOK                81

20   EXHIBIT 6    LETTER DATED OCTOBER 24, 2024 FROM  81

21                LAW OFFICE OF RICHARD H. POULSON

22   EXHIBIT 7    EMAIL THREAD BATES STAMPED       88

23                #41184.1-#41184.3

24   EXHIBIT 8    DEFENDANT SAMEER PADHYE'S        89

25                CONFIDENTIAL MEDIATION BRIEF
```

SAMEER PADHYE
DECEMBER 06, 2024

JOB NO. 1330894

```
 1   EXHIBIT 9     ARTICLES OF ORGANIZATION CA        92

 2                 LIMITED LIABILITY COMPANY DOCUMENT

 3   EXHIBIT 10    EMAIL BATES STAMPED #144394.1       92

 4   EXHIBIT 11    EMAIL BATES STAMPED #32372.1        96

 5   EXHIBIT 12    EMAIL BATES STAMPED #144473.1       98

 6   EXHIBIT 13    EMAIL BATES STAMPED #15804.1       102

 7   EXHIBIT 14    EMAIL BATES STAMPED #15611.1       104

 8   EXHIBIT 15    EMAIL BATES STAMPED #15998.1-      105

 9                 #15998.4

10   EXHIBIT 16    EMAIL BATES STAMPED #16018.1-      106

11                 #16018.2 WITH ATTACHMENT

12   EXHIBIT 17    EMAIL BATES STAMPED #15591.1       111

13                 AND DOCUMENT BATES STAMPED

14                 #16986.1

15   EXHIBIT 18    FOUR-PAGE DOCUMENT BATES STAMPED   114

16                 #16065.1, #17228.1, #17218.1 AND

17                 #17218.2

18   EXHIBIT 19    EMAIL BATES STAMPED #16115.1 WITH  115

19                 ATTACHMENT

20   EXHIBIT 20    EMAIL BATES STAMPED #15946.1 WITH  118

21                 ATTACHMENT AND DOCUMENT BATES

22                 STAMPED #17148.1

23   EXHIBIT 21    FOUR-PAGE DOCUMENT BATES STAMPED   122

24                 #15887.1-15887.3 WITH ATTACHMENT

25   EXHIBIT 22    EMAIL BATES STAMPED #15596.1 WITH  123
```

SAMEER PADHYE
DECEMBER 06, 2024

JOB NO. 1330894

```
 1                      ATTACHMENT

 2   EXHIBIT 23    SIX-PAGE DOCUMENT BATES STAMPED      125

 3                 #15901.1, #17129.1, #17129.2,

 4                 #17129.3, #17129.4, #17120.5

 5   EXHIBIT 24    EMAIL BATES STAMPED #16095.1-        126

 6                 #16095.2

 7   EXHIBIT 25    TWO-PAGE DOCUMENT BATES STAMPED      127

 8                 #15298.1 AND #16878.1

 9   EXHIBIT 26    EMAIL BATES STAMPED #15430.1 WITH    129

10                 ATTACHMENT

11   EXHIBIT 27    EMAIL BATES STAMPED #16047.1         129

12   EXHIBIT 28    EMAIL BATES STAMPED #16002.1-        131

13                 #16002.2

14   EXHIBIT 29    EMAIL BATES STAMPED #15607.1-        132

15                 #15607.2

16   EXHIBIT 30    EMAIL BATES STAMPED #16098.1,        133

17                 #16098.2, #15792.1, #15232.1

18   EXHIBIT 31    EMAIL BATES STAMPED #15899.1         134

19   EXHIBIT 32    EMAIL BATES STAMPED #16182.1-        135

20                 #16182.2

21   EXHIBIT 33    EMAIL BATES STAMPED #15683.1-        136

22                 #15683.2

23   EXHIBIT 34    EMAIL BATES STAMPED #15592.1         137

24                 AND A TWO-PAGE DOCUMENT BATES

25                 STAMPED 16988.1, 16988.2
```

```
 1    EXHIBIT 35    SEVEN-PAGE DOCUMENT BATES           138
 2                  STAMPED #15932.1-#15932.7
 3    EXHIBIT 36    EMAIL THREAD BATES STAMPED          139
 4                  #144210.1
 5    EXHIBIT 37    THREE-PAGE DOCUMENT BATES           141
 6                  STAMPED #144432.1-$144432.3
 7    EXHIBIT 38    EMAIL BATES STAMPED #144191.1       145
 8    EXHIBIT 39    EMAIL BATES STAMPED #144573.1       147
 9    EXHIBIT 40    EMAIL BATES STAMPED #144188.1       149
10    EXHIBIT 41    EMAIL BATES STAMPED #144098.1       150
11    EXHIBIT 42    SIX-PAGE DOCUMENT BATES STAMPED     152
12                  #144208.1, #144255.1-144255.5
13    EXHIBIT 43    SIX-PAGE DOCUMENT BATES STAMPED     153
14                  #1442001 AND #144253.1-#144253.5
15    EXHIBIT 44    TAYCANN, LLC, CONFIDENTIAL          154
16                  INFORMATION INVENTION ASSIGNMENT,
17                  AND ARBITRATION AGREEMENT
18    EXHIBIT 45    EMAIL BATES STAMPED #144179.1       156
19    EXHIBIT 46    EMAIL BATES STAMPED #144602.1       158
20                  WITH ATTACHMENT
21    EXHIBIT 47    DOCUMENT ENTITLED "TAYCANN WELLNESS 159
22                  PROVIDING THE BEST REMOTE CARE"
23    EXHIBIT 48    EMAIL THREAD BATES STAMPED          160
24                  #144178.1-#144178.2
25    EXHIBIT 49    EMAIL BATES STAMPED #144807.1 WITH  161
```

SAMEER PADHYE
DECEMBER 06, 2024

JOB NO. 1330894

```
 1                    ATTACHMENTS

 2    EXHIBIT 50    EMAIL WITH ATTACHMENT BATES STAMPED    165

 3                  #144233.1-#144233.2

 4    EXHIBIT 51    EMAIL WITH ATTACHMENT BATES STAMPED    167

 5                  #144225.1-#144225.2

 6    EXHIBIT 52    EMAIL WITH ATTACHMENT BATES STAMPED    170

 7                  #144176.1-#144176.3

 8    EXHIBIT 53    EMAIL WITH ATTACHMENT BATES STAMPED    172

 9                  #144766.1

10    EXHIBIT 54    EMAIL BATES STAMPED #144458.1-         173

11                  #144458.2

12    EXHIBIT 55    EMAIL BATES STAMPED #144491.1          174

13    EXHIBIT 56    EMAIL BATES STAMPED #144532.1          175

14                  WITH ATTACHMENTS

15    EXHIBIT 57    EMAIL BATES STAMPED #144683.1-         177

16                  #144683.4

17    EXHIBIT 58    EMAIL BATES STAMPED #144487.1          178

18    EXHIBIT 59    EMAIL BATES STAMPED #144686.1-         179

19                  #144676.5

20    EXHIBIT 60    EMAIL BATES STAMPED #144638.1          180

21

22

23

24

25
```

```
 1                  SAN FRANCISCO, CALIFORNIA

 2                     DECEMBER 6, 2024

 3

 4

 5                     SAMEER PADHYE,

 6  HAVING BEEN DULY ADMINISTERED AN OATH BY THE REPORTER, WAS

 7             EXAMINED AND TESTIFIED AS FOLLOWS:

 8

 9                       EXAMINATION

10  BY MR. SINGH:

11      Q.   Good morning, Mr. Padhye.  My name is Nitoj

12  Singh.  I'm with The Dhillon Law Group.  I represent

13  the plaintiff National Specialty Pharmacy in this

14  lawsuit.  So for convenience, I'm just going to refer

15  to that entity as NSP.  Does that make sense to you?

16      A.   Uh-huh.

17      Q.   So have you ever had your deposition taken

18  before?

19      A.   This is the first time.

20      Q.   So because we have a court reporter here, I'm

21  going to ask that you speak in a sort of measured pace

22  so the court reporter can transcribe everything.  We're

23  going to need verbal answers, so nods of the head are

24  not going to cut it.  "Uh-huhs" are not going to cut

25  it.  I'm also going to ask that we don't speak over
```

1    track of where they are, who they are, what's their

2    contact details, etcetera.

3        Q.    Did the modules Abhinay built for NSP also

4    contain provider data?

5        A.    Not from CRM point of view.  The data was who

6    has prescribed, how many patients, what medications and

7    that sort of thing.

8        Q.    So CRMs often kind of include automation for,

9    say, emailing people?

10       A.    Yeah.

11       Q.    The modules your brother built didn't include

12   any of that kind of functioning?

13       A.    No.

14       Q.    Did the NSP's monday.com account contain any

15   patient data?

16       A.    No.

17       Q.    Who else had access to the extent you know to

18   NSP's monday.com account?

19       A.    All the sales teams, sales members I'm sure,

20   Sanjiv, his son.

21       Q.    So sales, that would include Rayne, Michelle?

22       A.    Rayne, Michelle.  There was a Filipino lady.

23   I'm forgetting her name.  Those three.  Then we did

24   hire two more salespeople, sales ladies, in Tennessee,

25   but they didn't last more than a month.  So all of

SAMEER PADHYE                                              JOB NO. 1330894
DECEMBER 06, 2024

1   those.

2        Q.   The Tennessee salespeople, were they brought

3   in to expand the business?

4        A.   Yeah.

5        Q.   Were they successful?

6        A.   No.

7        Q.   Did they identify any customers?

8        A.   Not customers.  They identified all the

9   providers that we needed to go after.  But in reality

10  at that time there was nothing to sell.  We didn't have

11  even a pharmacy.  You are not going to export

12  everything from Vegas to Tennessee.

13       Q.   So if NSP had patients in Tennessee, you

14  couldn't mail stuff from Vegas to Tennessee?

15       A.   Yeah.  I think there is a law that you cannot

16  export or you cannot send anything more than 5 percent

17  of your total outside your state.

18       Q.   Other than monday.com, was there any other

19  cloud-based platform you used for NSP?

20       A.   You can say your email.

21       Q.   Setting aside email.

22       A.   No.

23       Q.   Did you ultimately leave NSP?

24       A.   No.

25       Q.   No.  You're still working there?

SAMEER PADHYE
DECEMBER 06, 2024

JOB NO. 1330894

```
1        A.    No.  He just stopped paying.  I never
2   resigned.  He never sent me any notification.  So it
3   was kind of friendly this thing.  And he said, "Right
4   now I can't pay you anymore because of the situation,
5   so why don't you work as an advisor."  That's it.
6        Q.    When did he tell you that?
7        A.    The 20th or 21st, I think.  I don't know
8   exactly.  But June of '23.
9        Q.    So June 20th or 21st, 2023.
10       A.    Yeah.
11       Q.    How did that conversation come up?
12       A.    The situation from the business point of view
13  changed dramatically because the government changed the
14  program.  That announcement came out like five or six
15  days before.  Then there was panic in the company.  The
16  day he -- my last day in Vegas was because he walked
17  into my office and basically said, "Look, you're the
18  highest paid employee here.  I don't have a good idea
19  where the business is going to go.  The compensation
20  from the government has changed significantly, so I
21  don't think I can pay you anymore so this is probably
22  the end of the road.  But what I would like to do is
23  keep you on as an advisor, but I can't pay you anymore.
24  But do me a favor.  Leave the office without meeting or
25  telling anybody because I don't want to cause panic if
```

1   you leave -- or if you're let go people will panic.  So

2   just leave.  Don't meet anyone."  And we used to go

3   there only from Monday through Thursday time frame.  He

4   was the same.  "So if you leave and don't come back,

5   nobody will ask questions."  But that's how we wanted

6   it to go.

7        Q.   So did that conversation happen on like a

8   Thursday and then you left?

9        A.   Thursday.  Definitely one of the Thursdays.

10       Q.   And then did you follow the guidance and not

11  talk to anybody on your way out?

12       A.   I didn't talk to anybody purposely.

13       Q.   Was that the last day you provided work?

14       A.   Yes.

15       Q.   Did you then turn into an advisor agreement?

16       A.   I didn't because then I realized about a week

17  later that my insurance is cut off, medical insurance.

18  That's when I sent him a message.  And I said, "Hey,

19  what's going on.  My medical insurance is cut off."

20  And he said, "Yeah.  Our payments have stopped.  I

21  can't pay you anymore.  Why don't you resign."  And I

22  said, "Why would I resign?  We haven't discussed this.

23  We have an agreement.  That's not the discussion.  We

24  agreed to continue as an advisor or something."  But

25  that's pretty much where things changed.

1          MR. SINGH:  Off the record.

2          (Recess.)

3          MR. SINGH:  Back on the record.

4      Q.   So I'm going to go back to your separation.

5  You're pretty confident the last day was a Thursday of

6  that week.  Did you provide any services to NSP

7  thereafter?

8      A.   No.

9      Q.   And did you ultimately then tell any of your

10  colleagues that you had left the company?

11      A.   Yeah.  I guess the only people that cared was

12  May and Rayne because I worked closely with them.

13  Michelle and Stuart, they had a very strange

14  relationship in a sense.

15      Q.   So you talked to May and Rayne about your

16  leaving NSP?

17      A.   Yes.  Not leaving.  That I'm no longer

18  required there.

19      Q.   Okay.  How did you describe to them the

20  circumstances under which you left?

21      A.   Everybody knew that the government

22  compensation had changed and what's going to happen in

23  the future.  Apparently something similar has happened

24  in the medical industry way before I joined NSP where

25  the insurance companies changed the compensation and

1  businesses go away.  So everybody knew, right?  So they

2  were sort of like, "Okay.  We were in the same era."

3  And as a result of that I am not going to be coming to

4  Vegas anymore.

5      Q.  So can you describe for me what the change

6  was that had this impact on the industry?

7      A.  Okay.  So basically there are five different

8  entities in the -- if you take a business and how the

9  money flows.  So providers give prescriptions to

10  patients.  Patients go to the pharmacy.  The pharmacy

11  then gives them the medicine or medications and then

12  they file to the insurance.  And then the rates and the

13  whole compensation is created by another entity in the

14  middle which is like a -- acts like a negotiating

15  broker.  With the White Card program the government was

16  running their own insurance firm, if you will, and they

17  didn't have any negotiating agency in the middle.  And

18  the compensation was substantially good, so the margins

19  are good.  Because the same Advil -- if you're going to

20  a normal patient, then they'll give you -- let's say

21  hypothetically your $1 Advil.  You will get $1.25 or

22  $1.15 as a compensation.  White Card will pay you $3.

23  And the government realized, "Oh, my God.  This thing

24  is expanding like a balloon."  So they now brought

25  somebody as a negotiating agency in the middle and that

1   changes now everything.  So it's no longer $3.  It's

2   going to be 15 cents on your dollar.  And all of a

3   sudden NSP's whole business proposition -- because we

4   were catering only to that market.  And then just the

5   business proposition changed.  The business is done at

6   that point.

7        Q.   So when they made the announcement, did they

8   tell the pharmacies how much their reimbursements were

9   going to be reduced by?

10       A.   There was a whole presentation done by the

11  government in different locations to educate people on

12  how this thing is going to change.  And the agency that

13  they got in, if I'm not mistaken, I'm not remembering

14  correctly now, it was called Caremark or something.

15  And they're notorious about setting up the compensation

16  to the pharmacies.  And in that pharmaceutical world

17  everybody immediately was like, "Oh, these guys are in.

18  That's it.  We're done."

19       Q.   Was there a presentation the government made

20  in the Las Vegas area on this change?

21       A.   I think, yeah, they did it in Vegas and Primm

22  both.

23       Q.   Did you attend that presentation?

24       A.   No.

25       Q.   Did somebody from NSP attend to the best of

1   your knowledge?

2        A.   I don't recall.  I don't remember.

3        Q.   Do you recall if it was in person or virtual

4   or how it took place?

5        A.   Yeah.  There was probably -- the government

6   agency set up those in multiple locations, the White

7   Card agency or the Department of Energy.  I don't know.

8        Q.   On or around June 21st, June 22nd, somewhere

9   in that time period, you forwarded yourself from your

10  NSP email account to your personal email account many

11  emails; correct?

12       A.   Yeah.

13       Q.   Did you start forwarding emails to yourself

14  after Sanjiv told you about this shift and moving you

15  to an advisor before?

16       A.   Even before as well, but probably around that

17  time frame because I knew I was not going to come back.

18  The PC was -- I handed over the PC and everything,

19  emptied the office.  And then since he asked me to be

20  an advisor, then that's why I probably downloaded some

21  emails.

22       Q.   So you downloaded the emails because he told

23  you you were going to be an advisor?

24       A.   Yes.

25       Q.   Did he instruct you to download those emails?

1      A.   No.

2      Q.   Did he tell you when he mentioned the advisor

3  what particular role -- what your role as an advisor

4  would be?

5      A.   He was still hopeful that things would

6  change.  And secondly, he wanted to -- and he has

7  attempted this various times.  We discussed this.  That

8  he wanted to be also an HHA, home health care agency,

9  the agencies that send those patients to you.  So he

10  wanted to be that agency itself.  That was his plan.

11      Q.   When did he first discuss that plan with you?

12      A.   Probably a month into when I joined.  Because

13  he knew that they actually have a better compensation

14  margin wise than even pharmacies.

15      Q.   Did you ever pursue that line of business for

16  NSP?

17      A.   We had a few meetings.  He hired two guys in

18  between, one of which he got engaged and then he ended

19  up suing her as well.  But yeah, we had a few rounds of

20  discussions.  I was not directly in charge of any of

21  that.  I was part of those discussions.  He wanted to

22  start something in Tennessee first.

23      Q.   Did you ever ask for an advisor agreement

24  from NSP?

25      A.   To tell you the truth, until that point we

1  were really friends.  And so when he explained to me

2  the situation, I knew the situation.  Me leaving that

3  place was nothing -- not bitter or any disdain at that

4  time.  I just left because I realized that things are

5  going to be drastically different now.

6          And then by the time I came back and then I

7  called him afterwards, the only trigger in between for

8  me to realize something is different is basically

9  because my insurance was canceled.  And he didn't give

10 me any warning or something and all of a sudden I

11 realize I'm exposed now.  So that's when I sent him a

12 text and basically said, "What's the deal here?"

13 That's when I realized he's acting different now.  So

14 no, we never went to the discussion or even the concept

15 of him giving me an advisor agreement.  He just

16 basically said, "Look, things are really bad now.  I

17 can't pay you now.  I can't pay your insurance either."

18          MR. POULSON:  You should focus on the

19 question.

20 BY MR. SINGH:

21     Q.   Did he communicate that to you via text or

22 was that on the phone?  How was that situation

23 communicated to you?

24     A.   Which one?

25     Q.   The fact that things were really bad.

1        A.    It was a text.

2        Q.    After your separation from NSP, did you start

3   another business?

4        A.    Yes.

5        Q.    What was that business?

6        A.    So I wanted to take a look into -- ColigoMed

7   also wanted to expand by using the same software

8   capability into remote care or remote care monitoring

9   on the patients.  There is an insurance provision in

10  Medicare that you can monitor the patients remotely.

11  And if you do so, then the insurance pays you for

12  providing that service and you submit that data to the

13  hospital basically.  Since it's remote, it's more

14  software oriented.  I thought to take a look at that

15  remote care business.

16       Q.    When did you first have the idea to pursue

17  this remote care business?

18       A.    July-August time frame.

19       Q.    Of 2023?

20       A.    Yeah.

21       Q.    So after you were separated from --

22       A.    Yeah.

23       Q.    And was that business Taycann Wellness?

24       A.    That's right.

25       Q.    When did you form Taycann Wellness?

1    A.    I added the name.  Taycann was my own company

2    that I formed in 2022 before joining NSP as my

3    investment vehicle.  So the pure purpose of that was

4    doing investment trading and investing.  I'm an

5    investor in a bunch of other things, so I just wanted

6    to put everything in that bucket.

7         When I decided to go into or thought of doing

8    something in remote patient care, that's when I changed

9    the front end to just Taycann Wellness.

10   Q.    Were you the only owner of Taycann Wellness?

11   A.    That's right.

12   Q.    Did that ever change?

13   A.    No.

14   Q.    Where was Taycann, LLC incorporated?

15   A.    California.

16   Q.    Was Taycann ever used for any investment

17   purposes?

18   A.    Not officially.  I thought of doing that and

19   then -- I thought that there would be some benefit of

20   doing investments in that fashion, but at that time the

21   CA [phonetic] advised me that no, you actually don't

22   get any benefit, in fact it will complicate the matter,

23   so just do it as your personal business.

24   Q.    You mentioned that Taycann was pursuing

25   remote patient monitoring?

1   intended to use the database information in furtherance

2   of the Taycann Wellness business with the employees."

3   Is that true or false?

4               MR. POULSON:  Object to the question.  It

5   assumes the existence of trade secrets, assumes facts,

6   lacks foundation and is overbroad.

7               THE WITNESS:  Okay.  So --

8               MR. POULSON:  Focus on the question.

9               THE WITNESS:  Yeah.  That's false.  I mean,

10  they wanted to get into the business.  The business was

11  dead anyway.

12  BY MR. SINGH:

13      Q.   Did you use any of NSP's information in

14  furtherance of Taycann Wellness?

15      A.   Absolutely not.

16              MR. POULSON:  Objection, vague and overbroad.

17  BY MR. SINGH:

18      Q.   Did you use any of NSP's information to come

19  up with any business ideas for Taycann Wellness?

20              MR. POULSON:  Same objections.

21              THE WITNESS:  Absolutely not.

22              MR. SINGH:  You can set Exhibit 2 to the

23  side.

24              (Exhibit No. 3 marked for identification.)

25  BY MR. SINGH:

1      Q.   You've been given what's been marked as

2   Exhibit 3 for this deposition but says "Exhibit 1" on

3   the front.

4           MR. POULSON:  Do you have an extra?

5           MR. SINGH:  Oh, sorry (handing document).

6           MR. POULSON:  Thanks.

7   BY MR. SINGH:

8      Q.   Do you recognize this exhibit?

9      A.   Yeah, this is the -- yeah.

10      Q.   What is it?

11      A.   NSP's employment document, confidential

12   information.

13      Q.   Is this an agreement that you signed?

14      A.   Yes.

15      Q.   Did you review the agreement before you

16   signed it?

17      A.   Yes.

18      Q.   Did you understand the contents of this

19   agreement before you signed it?

20      A.   Generally, yes.

21      Q.   What did you understand your obligation to be

22   generally under this agreement?

23      A.   I mean, it's huge.  What do you want me to

24   say?

25      Q.   You said you understood generally what the --

1        A.    Yeah.   It's a confidentiality agreement.

2        Q.    What does that mean to you?

3        A.    To keep the information confidential.

4        Q.    And did you do that?

5        A.    While I was working there, yes.

6        Q.    Did you understand that you had an obligation

7    to keep information confidential even after you left

8    the employment of NPS?

9        A.    Yes.

10       Q.    Did you do that?

11       A.    Yes.

12       Q.    Do you have any reason to believe that this

13   agreement is not enforceable?

14       A.    I don't know.

15             MR. POULSON:   Objection, calls for a legal

16   conclusion.

17   BY MR. SINGH:

18       Q.    I'm asking you if you have any reason to

19   believe.

20       A.    I don't know.

21       Q.    You don't know if you have any reason to

22   believe this is enforceable or not?

23       A.    Yes.

24       Q.    Okay.   It could be enforceable.   It could not

25   be enforceable?

1        A.    Yeah.  I don't know.

2        Q.    Okay.  I want you to look at paragraph three.

3   It has the heading entitled "Confidentiality."

4        A.    Uh-huh.

5        Q.    And if you turn to the next page, it provides

6   an example of confidential information.  About seven

7   lines down it says, "By example, and without

8   limitation, Company Confidential Information includes

9   any and all non-public information that relates to the

10  actual or anticipated business and/or products,

11  research or development of the Company or to the

12  Company's technical data, trade secrets, or know-how,

13  including, but not limited to, research, product plans,

14  or other information regarding the Company's products

15  or services and markets therefore, customer lists,

16  patient and physician information, and customers."  And

17  it continues on from there.

18       A.    Yeah.

19       Q.    During your time with NSP, did you have

20  access to any of these types of information as

21  described herein?

22       A.    Yes.

23       Q.    And did you understand that information to be

24  NSP's confidential information?

25            MR. POULSON:  Objection, vague and overbroad.

 1   BY MR. SINGH:

 2       Q.   I'm sorry.  I missed your answer.  Can you

 3   repeat it?

 4       A.   Yes.

 5       Q.   Let's jump down to paragraph 'B' right below.

 6   The heading is "Nonuse and Nondisclosure."  It says, "I

 7   agree that during and after my employments with the

 8   Company, I will hold in the strictest confidence and

 9   take all reasonable precautions to prevent any

10   authorized use or disclosure of Company confidential

11   information."

12       A.   Yep.

13       Q.   Did you review that before you signed this

14   agreement?

15       A.   Yes.

16       Q.   And did you honor that obligation?

17       A.   Yes.

18       Q.   Let's go to what's marked as page 6 at the

19   bottom of this agreement.  There's the heading 'B,'

20   "Return of Company Property."  Do you see that?

21       A.   Yeah.

22       Q.   It says, "I understand that anything that I

23   created or worked on for the Company while working for

24   the Company belongs solely to the Company and that I

25   cannot remove, retain or use such information without

1  the Company's expressed written permission."  Do you

2  understand that provision?

3          A.    Yes.

4          Q.    And then it says, "Accordingly, upon

5  separation from employment with the Company or upon the

6  Company's request at any other time, I will immediately

7  deliver to National Specialty Pharmacy, LLC and will

8  not keep in my possession, recreate or deliver to

9  anyone else any and all company property, including but

10  not limited to, Company Confidential Information."  Do

11  you see that?

12          A.    Yeah.  Uh-huh.

13          Q.    After your separation from employment with

14  NSP, did you deliver to NSP any of the company property

15  or company confidential information in your possession?

16          A.    Everything is in the PC, so I gave that PC

17  back.  He wanted me to be an advisor, so I downloaded a

18  few things.  I still officially don't have any

19  separation agreement -- letter from NSP.  They never

20  sent anything.

21          MR. POULSON:  Just focus on the question.

22          THE WITNESS:  Yes.

23  BY MR. SINGH:

24          Q.    So if they didn't send you a separation

25  agreement or letter, do you still believe that you are

1  an employee of NSP?

2      A.   No.  They don't pay me, so no.

3      Q.   Do you believe that you're still an advisor

4  for NSP?

5      A.   I would advise, but that was the last

6  communication.

7      Q.   So do you believe you're still an advisor for

8  NSP?

9      A.   I don't know what legal aspect of it, but

10  that's how the discussion ended.

11      Q.   I'm not asking for your impression.  I'm

12  asking you -- I'm not asking for your impression or

13  understanding of legal aspects.  I'm asking you simply,

14  you as an individual to the best of your understanding,

15  do you currently believe that you are now an advisor to

16  NSP?

17      A.   No.

18      Q.   When was the last time you believe that you

19  were an advisor to NSP?

20      A.   I don't remember the date.

21      Q.   Approximately.

22      A.   I don't know.

23      Q.   You have no general approximation?

24      A.   No.

25      Q.   Was it in the last month?

1      A.    Possibly within a month or two after this

2  whole episode happened.

3      Q.    So a month or two after your resignation?

4      A.    I never resigned.

5      Q.    Okay.  A month or two after your separation

6  from NSP you stopped being an advisor to NSP?

7      A.    I guess so, yes.

8      Q.    And at that time did you return to NSP any

9  company property or company confidential information?

10      A.    I tried to establish communication with

11  Sanjiv to take over the database access and monday.com.

12  No response.  And that's pretty much when I went back

13  to him.  Because he should have turned off all my

14  access or should have taken over because that's where

15  all the information was.

16      Q.    So with the emails that you had emailed

17  yourself, did you seek to destroy those at that time or

18  return them to NSP in some manner?

19      A.    Most of those I did.  I had no use for them

20  anyway.

21      Q.    You deleted those emails?

22      A.    Some of them, yeah.

23      Q.    When did you delete them?

24      A.    Probably the July/August time frame.

25      Q.    After this lawsuit was filed, did you delete

1   any emails thereafter?

2        A.   No.

3        Q.   Let's go to the next page.  Paragraph nine

4   says, "Solicitation of Employees."  Do you see that?

5        A.   Yeah.

6        Q.   It says, "To the fullest extent permitted

7   under applicable law, I agree that during my employment

8   and for a period of 12 months immediately following the

9   termination of my relationship with the company for any

10  reason, whether voluntary or involuntary, with or

11  without cause, I will not directly or indirectly

12  solicit any of the Company's employees to leave their

13  employment at the Company."  Do you see that?

14       A.   Yes.

15       Q.   Did you honor that provision of the contract?

16       A.   Yes.

17       Q.   You didn't solicit Rayne Bridges to leave

18  NSP?

19       A.   Not at all.  They left on their own, as I

20  said, because of the -- because of their own issues

21  whatever it is.

22       Q.   You also didn't solicit May Sana to leave

23  NSP?

24       A.   No.

25       Q.   I want you to turn to what's marked as

1    Exhibit C, that's the termination certification.  If

2    you look at the top, it's marked as page 13 of 15.

3         A.   Yeah.

4         Q.   Do you see what's labeled at the top as

5    Exhibit C, "National Specialty Pharmacy, LLC

6    Termination Certification"?

7         A.   Yeah.

8         Q.   Were you provided a copy of this termination

9    certification after you separated from NSP?

10        A.   Yes.  Separated?

11        Q.   Yes.

12        A.   None of this was given after anything I

13   received afterwards, no.

14        Q.   May Sana didn't email you a copy of this

15   after you separated from NSP?

16        A.   I don't recall, no.

17        Q.   Do you recall signing and returning this

18   termination certification?

19        A.   I don't recall.  No.  If I signed it before,

20   I don't know.  But I don't recall if she sent me

21   anything.

22        Q.   You can set that aside.

23             (Exhibit No. 4 marked for identification.)

24   BY MR. SINGH:

25        Q.   Do you recognize what's been marked as

1       Q.   No?

2       A.   No.  Just to be clear, this is a document in

3   December.  Sanjiv asked for a loan in April.

4            (Exhibit No. 8 marked for identification.)

5   BY MR. SINGH:

6       Q.   Do you recognize what's been marked as

7   Exhibit 8?

8            MR. POULSON:  I'm going to object that it is

9   a confidential mediation brief.  So I'm going to object

10  to its use or admissibility.

11  BY MR. SINGH:

12      Q.   I want you to turn to Exhibit A.

13      A.   Yeah.

14      Q.   Do you recognize what's identified as Exhibit

15  A?

16      A.   It's my resume.

17      Q.   Does your resume list every single place of

18  your employment from the past?

19      A.   Yes.

20      Q.   Does it list your employment with NSP?

21      A.   No.

22      Q.   In every resume you've sent following your

23  separation from NSP, have you listed NSP as a past

24  employer?

25      A.   As I said, the only place I applied is Arista

1    and it's not there.

2              MR. POULSON:  I just want to note, this is

3    the resume you submitted to NSP?

4              THE WITNESS:  Yeah.

5              MR. SINGH:  Counsel, if you want to testify,

6    you can get sworn in.  Otherwise, I'm going to seek

7    court intervention if you keep interrupting the witness

8    and offering your own guidance during the deposition.

9    Are we clear?

10             MR. POULSON:  Yes, sir.

11   BY MR. SINGH:

12        Q.   Let's turn to Exhibit B.  Do you recognize

13   what's been marked as Exhibit B?

14        A.   Yeah.

15        Q.   What is it?

16        A.   It's an email between me and Sanjiv.

17        Q.   What were you discussing in this October 10,

18   2022 email thread?

19        A.   The salary and package.

20        Q.   This is in relation to your contemplated role

21   at NSP?

22        A.   Correct.

23        Q.   I want you to look at the bottom of the first

24   page.  There's an email from Sanjiv dated October 9th,

25   2022.  Do you see that?

1       A.    Yeah.

2       Q.    At 1:30 p.m.  He writes, "Hi Sameer.  Happy

3   Sunday."  The next page it continues.  "I understand

4   what you're saying, but since this is a whole new line

5   of business (I know you have some biopharma

6   experience), I can't afford to pay you more than twice

7   what my lead pharmacist is making with no experience in

8   our business."  Do you see that?

9       A.    Yeah.

10      Q.    Do you have any understanding as to what

11  Sanjiv was referencing when he said "I know you have

12  some biopharma experience"?

13      A.    No, I don't know what he assumed.  Maybe

14  because I worked in Enlil, which is a medical device

15  company, he might have assumed that.  I have no idea.

16      Q.    Going back to the first page.  In any of

17  these emails did you seek to correct him and say "No, I

18  do not have any biopharma experience"?

19      A.    No.

20           MR. POULSON:  Objection, the document speaks

21  for itself.

22  BY MR. SINGH:

23      Q.    Sorry.  I didn't catch your answer.  Can you

24  repeat it?

25      A.    No.

```
 1                MR. SINGH:  We've been going for an hour.
 2   Why don't we take a short break.
 3                (Lunch recess.)
 4                MR. SINGH:  Back on the record.
 5                (Exhibit No. 9 marked for identification.)
 6   BY MR. SINGH:
 7        Q.   Mr. Padhye, do you recognize what's been
 8   marked as Exhibit 9?
 9        A.   Yes.
10        Q.   And what is this?
11        A.   A company document.
12        Q.   Is this the articles of organization for
13   Taycann, LLC?
14        A.   Yes.
15        Q.   And it looks like it was incorporated or
16   formed on July 28th, 2022?
17        A.   Yeah.
18        Q.   Is that consistent with your recollection of
19   when your Taycann entity was formed?
20        A.   Yeah.
21                (Exhibit No. 10 marked for identification.)
22   BY MR. SINGH:
23        Q.   Do you recognize what's been marked as
24   Exhibit 10?
25        A.   Yeah.
```

1       Q.    And what is it?

2       A.    It's a letter to Owen and Mike.

3       Q.    Who are Owen and Mike?

4       A.    They were the consultants for NSP for

5   accounting system.

6       Q.    Accounting system?

7       A.    Yeah.  They were going to set up the

8   accounting for NSP.

9       Q.    They weren't going to help you acquire a

10  pharmacy?

11      A.    Me?

12      Q.    To help NSP to acquire a pharmacy?

13      A.    No.

14      Q.    Did you send this email to them on June 17th,

15  2023?

16      A.    Yes.

17      Q.    And the subject line is "Looking for new

18  compounding pharmacy"?

19      A.    Yes.

20      Q.    And you wrote on June 17th, "I interacted

21  with you back in November last year through National

22  Specialty Pharmacy.  Unfortunately, NSP did not move

23  forward with the project but now I have left NSP and

24  want to start my own."

25      A.    Uh-huh.

1       A.   Okay.  Yeah.

2       Q.   So then your termination was after you had

3   reached out to Owen and Mike in the last exhibit?

4       A.   So this is from May, not from Sanjiv.  And as

5   I said, at no point Sanjiv indicated that my services

6   are terminated.

7       Q.   Okay.

8       A.   Yeah.  It was a very -- until that point the

9   discussion between us was very, very normal.  And he

10  just requested me that I should not meet anybody and

11  just leave because he cannot afford to pay.

12      Q.   Okay.  But on June 17th you told Owen and

13  Mike that you left NSP?

14      A.   Yes.

15      Q.   So did you leave NSP by June 17th or

16  June 22nd?

17      A.   Can we revisit and see that date so that we

18  can avoid this?

19           MR. POULSON:  Are you just looking at a

20  calendar?

21           THE WITNESS:  Yeah.

22           MR. POULSON:  The dates are whatever they

23  are.

24           THE WITNESS:  Yeah.  The Thursday is the

25  22nd.

1   BY MR. SINGH:

2       Q.   So Thursday, June 22nd, 2023, is when Sanjiv

3   told you that he couldn't afford to keep you on?

4       A.   Yeah.

5       Q.   And you didn't come to work for NSP

6   thereafter?

7            MR. POULSON:  Objection, vague.

8   BY MR. SINGH:

9       Q.   Is that about right?

10      A.   Yeah.

11      Q.   So prior to that date is when you sent this

12  email on June 17th?

13      A.   Correct.

14           (Exhibit No. 12 marked for identification.)

15  BY MR. SINGH:

16      Q.   Do you recognize what's been marked as

17  Exhibit 12?

18      A.   Yes.

19      Q.   What is it?

20      A.   Yeah.

21      Q.   What is this email conveying?

22      A.   They're asking to see if we would like to

23  view a pharmacy in LA.

24      Q.   And this was in discussions to buy a pharmacy

25  in LA?

1      A.   Their suggestion is yes.

2      Q.   Were you interested in buying a pharmacy at

3   this time?

4      A.   We haven't established the business as I

5   said.  The business was dead.  I had no idea why I

6   should be in this business.  So they recommended we

7   should go and take a look at it, which I didn't.

8      Q.   Okay.  So this is an email you sent to Mike

9   and Owen on June 21st, 2023.  Is that correct?

10     A.   Yes, June 2023, yes.

11     Q.   And you say, "I have completed the form and

12  bank details.  Let me know as soon as possible when you

13  sign the contract so we can start.  I would like to

14  send you the information about the 503B facility from

15  LA as time is of the essence."  Do you see that?

16     A.   Yes.

17     Q.   What did you mean by "time is of the

18  essence"?

19     A.   I did pay them to consult on 503B, but at

20  this time I'm still trying to understand what the 503B

21  business looks like.

22     Q.   So what was the urgency?  Why did you say

23  "time is of the essence"?

24     A.   I don't know.  There was no urgency and

25  nothing happened.

1      Q.   There was no urgency, but you told them "time

2   is of the essence"?

3      A.   Yeah.

4      Q.   It seems like in this email you say, "I would

5   like to send you the information about the 503B

6   facility."  What information were you sending to them

7   about the 503B facility?

8      A.   That there is a 503B facility somewhere in

9   LA.

10     Q.   And you were interested in buying that 503B

11  facility?

12     A.   No.  As I said, first I want to understand

13  the business.  One business just got shut down because

14  the government changed the priority.  If I want to

15  invest in another business, I want to know what that

16  business is.

17     Q.   At some point did you come to an

18  understanding of what the pharmacy business was and

19  whether or not you wanted to invest in it?

20     A.   Not the 503B.  The license that NSP had was a

21  different license.  That was retail.

22     Q.   Okay.  I'm asking you generally about

23  pharmacies.  Did you ever come to a conclusion that you

24  did not want to enter into the pharmacy business?

25          MR. POULSON:  Objection, vague, overbroad.

1            THE WITNESS:  General pharmacy business, yes.

2   BY MR. SINGH:

3        Q.   When was that?

4        A.   During the course of NSP talking to people.

5        Q.   So during the course of NSP, you had

6   concluded that you did not want to enter into the

7   general pharmacy business?

8        A.   No.  I just said the conclusion was the

9   general pharmacy business is usually not interesting.

10  The margins are very low.

11       Q.   So you didn't want to enter into the general

12  pharmacy business?

13       A.   Never.  Not at all.

14       Q.   But you were interested in pursuing a 503B

15  pharmacy.  Is that correct?

16       A.   If it is something different and profitable.

17  It's a business I'm trying to evaluate.  That' it.

18       Q.   And did you ever come to a conclusion as to

19  whether or not you wanted to invest in a 503B pharmacy

20  business?

21       A.   Yes, I did.

22       Q.   When was that?

23       A.   Sometime after this.  I don't know the date.

24  But the reality is it's not a profitable business

25  either.

1      Q.    Approximately when did you come to that

2    conclusion?

3      A.    The June, July, August time frame.

4      Q.    July-August of 2023?

5      A.    Yeah.

6            (Exhibit No. 13 marked for identification.)

7    BY MR. SINGH:

8      Q.    Do you recognize what's been marked as

9    Exhibit 13?

10     A.    Yeah.

11     Q.    And what is it?

12     A.    This is a message from Srividya from

13   ColigoMed.

14     Q.    And at the top here it's you sending this

15   email from your NSP account to your personal gmail

16   account on June 21st, 2023?

17     A.    Yeah.

18     Q.    That's correct?

19     A.    Yeah.

20     Q.    And this is before June 22nd where you told

21   us that Sanjiv asked you to be an advisor?

22     A.    Yes.

23     Q.    Okay.  So the day before he told you to be an

24   advisor, you were already emailing yourself on your NSP

25   account to your personal account?

```
1        A.   Okay.

2        Q.   Is that correct?

3        A.   Yeah.

4        Q.   Why did you send this email from your NSP

5   account to your personal account on June 21st?

6        A.   I don't know.  This is ColigoMed's email.

7        Q.   I know that it's a ColigoMed email.  Why did

8   you send it from your NSP account to your personal

9   account?

10       A.   Because it's between me and Srividya, I

11  guess.

12       Q.   It's between you and Srividya while you were

13  conducting NSP business; correct?

14       A.   While I was at NSP, yes.

15       Q.   Okay.  So now that your -- that still doesn't

16  explain why you sent it to your personal account.

17       A.   Okay.

18       Q.   Can you explain to me why you sent it to your

19  personal account?

20       A.   I don't know.

21       Q.   You don't know?

22       A.   No.

23       Q.   That's your answer?

24       A.   Yeah.

25       Q.   Okay.
```

1              (Exhibit 14 marked for identification.)

2    BY MR. SINGH:

3         Q.   Do you recognize what's been marked as

4    Exhibit 14?

5         A.   Okay.

6         Q.   Is this a June 21st, 2023 email you sent from

7    your NSP email account to your personal gmail account?

8         A.   Yeah.

9         Q.   Why did you send this email from your NSP

10   account to your personal gmail account?

11        A.   Again, as an advisor if he wanted me to

12   continue to look into data.  Because that's what I used

13   to do for him.

14        Q.   But you told us earlier that he asked you to

15   be an advisor on the 22nd.  This email was sent on the

16   21st.

17             MR. POULSON:  Objection.  Is there a

18   question?

19   BY MR. SINGH:

20        Q.   So why did you send this email on the 21st if

21   he hadn't yet asked you to be an advisor yet?

22        A.   I don't know.

23        Q.   You don't know.  What is PopupRX?

24        A.   I have no idea.

25        Q.   Did you talk to anyone at PopupRX after you

1  left NSP on June 22nd, 2023?

2       A.   I don't even know.  I don't remember what is

3  PopupRX.  Can you --

4       Q.   You don't remember, but you still thought it

5  was valuable to send this email from your NSP account

6  to your personal account?

7            MR. POULSON:  Objection.  There's not a

8  question.  Vague as to the term "valuable."

9            (Exhibit No. 15 marked for identification.)

10 BY MR. SINGH:

11      Q.   Do you recognize what's been marked as

12 Exhibit 15?

13      A.   Yeah.  Melissa to me.  This is that Vivoo

14 product.

15      Q.   What was the Vivoo product?

16      A.   That's the one that I told you.  The card

17 that you pee on to get your medical health.

18      Q.   And this is also an email you sent from your

19 NSP account to your personal account but this time on

20 June 22nd, 2023.  Is that correct?

21      A.   Uh-huh.

22      Q.   Why did you send this email to yourself on

23 June 22nd, 2023?

24      A.   Just as an interesting product.  Nothing

25 else.  It was nothing.  I don't know.

1      Q.   Did you ultimately discuss this product with

2   Vivoo while you were at Taycann Wellness?

3      A.   No, not at all.

4      Q.   Okay.  But you did discuss earlier in your

5   testimony today that you explored this as a product

6   option?

7      A.   For NSP, yes.

8      Q.   But not for Taycann Wellness?

9      A.   No.  No.

10      Q.   So then why did you email yourself this?

11      A.   As I said, maybe it's an interesting product.

12   I don't know.  I don't remember.  There's nothing that

13   happened afterwards either.

14           (Exhibit No. 16 marked for identification.)

15   BY MR. SINGH:

16      Q.   Do you recognize what's been marked as

17   Exhibit 16?

18      A.   Uh-huh.

19      Q.   What is it?

20      A.   NSP financials.

21      Q.   So at the front did you send yourself an

22   email from your NSP email account to your gmail account

23   on June 21st, 2023?

24      A.   Yeah.

25      Q.   And the attachment included a May 23, 2023

1  financials.xlxs?

2      A.   Yeah.

3      Q.   And then below May Sana on June 13th, 2023

4  says, "Here are the May 2023 P&Ls.  Let me know if you

5  have any questions."

6      A.   Correct.

7      Q.   Why did you send yourself this email from

8  your NSP account to your personal account?

9      A.   As I said, the advisor part.  And I used to

10  review the financials with NSP on a monthly, almost

11  weekly basis.

12      Q.   But you were asked to be an advisor on

13  June 22nd, 2023; correct?

14      A.   Yeah.

15      Q.   But you sent this email to yourself on

16  June 21st, 2023; correct?

17      A.   Yeah.

18      Q.   So how did you determine that Sanjiv was

19  going to ask you the next day to be an advisor?

20      A.   I didn't.

21      Q.   Okay.  But you sent yourself this email

22  before he asked you to be --

23      A.   Yeah, but there are a bunch of other emails

24  that I have transferred before from my own computer,

25  which is -- NSP never gave me an operating computer.

1    I'm just moving emails from my one account to another

2    account.

3         Q.   Why?

4         A.   I don't know.  Didn't have any malicious

5    intent at all.

6              MR. POULSON:  I have a question.  Is this the

7    entirety of the exhibit?

8              MR. SINGH:  No, it's the shortened redacted

9    version of the exhibit.

10             MR. POULSON:  So this is an incomplete

11   version of this email?

12             MR. SINGH:  Correct.

13             MR. POULSON:  Is there any reason this is

14   redacted?

15             MR. SINGH:  Because the information on the

16   exhibit is attorney's eyes only and this makes it

17   easier to use in this format.

18             MR. POULSON:  Have you declared this

19   attorney's eyes only?

20             MR. SINGH:  When we make our full production,

21   we'll declare it attorney's eyes only.  As you know,

22   pursuant to our protected order I can declare this

23   transcript confidential or attorney's only after it's

24   completed.

25             MR. POULSON:  And I can challenge that.

```
1              MR. SINGH:  Sure.
2         Q.  So can you again summarize for me the reasons
3    why you sent this email to yourself on June 21st?
4              MR. POULSON:  Asked and answered.
5              THE WITNESS:  No, I cannot.
6    BY MR. SINGH:
7         Q.  So you're refusing to answer the question?
8         A.  No, I answered already.
9         Q.  Okay.  Tell me again.  I didn't understand
10   you.
11             MR. POULSON:  Objection.  Just answer as you
12   can.
13             THE WITNESS:  Okay.  I don't know why I sent
14   this email.  Maybe it's like normal practice.  I send
15   it to myself from my one computer to another account.
16   BY MR. SINGH:
17        Q.  How often prior to June 21st, 2023 would you
18   send yourself emails from your NSP account to your
19   personal gmail account?
20             MR. POULSON:  Objection, overbroad.
21             THE WITNESS:  I don't remember doing it.
22   BY MR. SINGH:
23        Q.  Did you do it regularly?
24             MR. POULSON:  Same objections.
25             THE WITNESS:  Did I do it regularly?
```

1    Probably not.

2    BY MR. SINGH:

3        Q.   But just the day before you were asked to

4    leave the company is when you sent this one?

5            MR. POULSON:  Objection.  There's not a

6    question.

7            THE WITNESS:  Yes.

8    BY MR. SINGH:

9        Q.   A hell of a coincidence; right?

10           MR. POULSON:  Don't answer.

11           THE WITNESS:  Okay.

12   BY MR. SINGH:

13       Q.   Do you think NSP's financial information is

14   confidential information?

15           MR. POULSON:  Objection, calls for a legal

16   conclusion, vague, overbroad.

17   BY MR. SINGH:

18       Q.   You can answer.

19           THE WITNESS:  Should I answer or not?

20           MR. POULSON:  I guess, can you define

21   "confidential"?

22           MR. SINGH:  No, I cannot.

23           MR. POULSON:  Okay.

24   BY MR. SINGH:

25       Q.   Can you answer the question?

1              MR. POULSON:  Go ahead.

2              THE WITNESS:  Yes.

3    BY MR. SINGH:

4        Q.   You believe that financials are confidential

5    information?

6        A.   Yes.

7              (Exhibit No. 17 marked for identification.)

8    BY MR. SINGH:

9        Q.   Do you recognize what's been marked as

10   Exhibit 17?

11       A.   Yes.

12       Q.   What is it?

13       A.   Email from Stuart.

14       Q.   So the top here is a June 21st, 2023 email

15   you sent from your NSP account to your personal

16   account.  Is that correct?

17       A.   Yes.

18       Q.   And below is a May 12th, 2023 email from

19   Stuart Koszer to you; correct?

20       A.   Yes.

21       Q.   Who is Stuart Koszer?

22       A.   He's the chief pharmacist.

23       Q.   Okay.  He writes, "You asked me for an answer

24   on the non DOL compound business."

25       A.   Yes.

1      Q.   What's the "non DOL compound business"?

2      A.   Non DOL is department of labor compound

3   business.

4      Q.   He says, "Well, here is the total non DOL

5   compound business from 1/1/23 to yesterday."

6      A.   Uh-huh.

7      Q.   And in the attachment it's a profit and total

8   summary; correct?

9      A.   Yeah.

10     Q.   Of prescriptions filled from January 1st,

11   2023 to May 12th, 2023.  And then the other limitations

12   are compound scripts only and scripts for the state of

13   Nevada; correct?

14     A.   Uh-huh.

15     Q.   Is this NSP's confidential information?

16          MR. POULSON:  Objection, vague, overbroad,

17   calls for a legal conclusion.  I'm sorry.  Is this a

18   complete exhibit?

19          MR. SINGH:  No.  It's a redacted, partial

20   exhibit.

21     Q.   You can answer.

22     A.   Say the question again.

23     Q.   Is the information Stuart was providing to

24   you in the attachment NSP's confidential information?

25          MR. POULSON:  Objection, vague as to

 1  January 21st, 2023?

 2      A.   I don't know.

 3      Q.   You don't know.  Isn't it because you were

 4  getting ready to form a competing business and you

 5  wanted a leg up?

 6          MR. POULSON:  Objection, leading, calls for

 7  speculation.

 8          THE WITNESS:  The business was dead.  There

 9  is no reason to get into that business.

10  BY MR. SINGH:

11      Q.   Why steal their confidential information?

12          MR. POULSON:  Objection.  Don't answer that.

13  You've got to give me a second.

14          THE WITNESS:  Sorry.

15          (Exhibit No. 18 marked for identification.)

16  BY MR. SINGH:

17      Q.   Do you recognize what's been marked as

18  Exhibit 18?

19      A.   Yes.

20      Q.   Exhibit 18 is another email you sent from

21  your NSP email account to your personal account on

22  June 21st, 2023; correct?

23      A.   Yes.

24      Q.   The subject line is "Compound Claim Example"

25  and there's two attachments, pain_cream_example.pdf and

 1  ESI_pharmacy_agreement.pdf.  Do you see that?

 2      A.   Yes.

 3      Q.   Why did you send this email to yourself on

 4  June 21st, 2023?

 5      A.   I don't know.

 6      Q.   Do you have an understanding of what the

 7  Express Scripts, Inc. pharmacy provider agreement is

 8  that starts on the second page?

 9      A.   It's an agreement between Express Scripts and

10  NSP.

11      Q.   Why would you need to send a copy of that to

12  your personal email address?

13      A.   Same answer.  I don't know.

14           MR. POULSON:  Is that the entirety of the

15  email and attachment or is that redacted as well?

16           MR. SINGH:  It's a partial exhibit.

17           (Exhibit No. 19 marked for identification.)

18  BY MR. SINGH:

19      Q.   Do you recognize what's been marked as

20  Exhibit 19?

21      A.   Yes.

22      Q.   It's yet another June 21st, 2023 email from

23  your NSP account to --

24      A.   Yes.

25      Q.   -- your gmail account; correct?

1        A.    Yes.

2        Q.    Why don't you let me finish the questions

3    first so that we can get a clear record, please.

4              The subject line of this is "DOE Comparison

5    6.5.12"; correct?

6        A.    Yes.

7        Q.    There was an earlier email where May writes

8    to you on June 6th, 2023.  And she writes, "I put

9    together a claim comparison between MyMatrixx and DOE

10   insurances.  Let me know if you have any questions."

11   Do you see that?

12       A.    Yes.

13       Q.    What is "MyMatrixx"?

14       A.    Oh, MyMatrixx is the internal, I think,

15   database.

16       Q.    Internal database for what?

17       A.    For prescriptions.

18       Q.    So this is an NSP internal database?

19       A.    Yeah.

20       Q.    And what is "DOE insurances"?

21       A.    Department of energy insurance.

22       Q.    Okay.  What was May, to the best of your

23   understanding, referring to when she says she's putting

24   "together a claim comparison between MyMatrixx and DOE

25   insurances"?

1            MR. POULSON:  Objection, calls for

2    speculation.  Also want to note this is an incomplete

3    and redacted exhibit.

4    BY MR. POULSON:

5        Q.   You can answer.

6        A.   I don't know.  Because everything in

7    MyMatrixx is DOE.  So I'm not sure what it means by

8    "claim comparison."  I don't know.

9        Q.   So if you go to the exhibit, it's a table

10   that includes the date dispensed, script, customer

11   name, prescriber and drug name.  Do you see that?

12       A.   Yeah.

13       Q.   If this table contained customer name

14   information, prescriber information and drug name

15   information, would that be covered under HIPAA to the

16   best of your understanding?

17            MR. POULSON:  Objection, calls for a legal

18   conclusion, assumes facts, incomplete hypothetical.

19            THE WITNESS:  So the question is HIPAA?

20   BY MR. SINGH:

21       Q.   Yes.

22       A.   Yes.

23       Q.   So why did you send this email from your NSP

24   account to your personal account?

25       A.   I don't know.

1        Q.   Did you consider the information reflected on

2   the table NSP's confidential information?

3             MR. POULSON:  Objection.  There's very little

4   information in that table, so it's an incomplete

5   hypothetical, calls for speculation.

6             You don't need to answer that.

7             MR. SINGH:  Are you instructing your client

8   not to answer?

9             MR. POULSON:  Yes.

10             MR. SINGH:  Please mark that for the record.

11             It's your choice, but we'll be revisiting

12   this on a motion and calling you back here.

13             MR. POULSON:  Well, he'll be in India.  So if

14   there's any reconvening, it will be by Zoom.  But we'll

15   see.

16             MR. SINGH:  We will see about that.

17             MR. POULSON:  Okay.

18             (Exhibit No. 20 marked for identification.)

19   BY MR. SINGH:

20        Q.   Do you recognize what's been marked as

21   Exhibit 20?

22        A.   I don't know what the email is.  I don't know

23   what the content is.

24        Q.   What is the email?

25        A.   It's from May to me on June 5th.

1        Q.   And then you later forwarded this email from

2    your NSP account to your personal account on June 21st;

3    correct.

4        A.   Yes.

5        Q.   Why did you forward this from your NSP

6    account to your personal account?

7        A.   I don't know.

8        Q.   And what was May trying to convey to you in

9    this original email?

10        A.   I don't know.  As I said, I don't know what's

11    in the table.

12        Q.   Based on the headings in the table you can't

13    come to an understanding of what's in the table?

14             MR. POULSON:  Objection, calls for

15    speculation, incomplete hypothetical.

16             You've redacted these documents and then

17    you're asking him what it is or what the meaning is.

18             MR. SINGH:  Well, Counsel, the specifics of

19    what the particular patient name, prescriber, drug name

20    is irrelevant to the question.  Your client can

21    assume --

22             MR. POULSON:  You're asking a hypothetical of

23    certain things if they existed could possibly be

24    something else.

25             MR. SINGH:  Sure.  If I tell you that this

1   table contains the information it purports to contain,

2   that's a valid hypothetical question.  The name of the

3   particular patient, the name of the particular

4   prescriber, the name of the particular drug name is all

5   irrelevant to my question.

6           MR. POULSON:  So a question could be, if

7   there was a piece of paper that had this information

8   that you can't see that I'm describing to you would

9   that be considered confidential?  That's the

10  hypothetical.  So you don't even have to have these

11  exhibits.  They're irrelevant to your question.

12          MR. SINGH:  No.  The exhibit is relevant

13  because I'm showing you what was sent and these are the

14  headings.

15          MR. POULSON:  It doesn't matter.  You could

16  just say it's a piece of paper that has these headings.

17  This is irrelevant.

18          MR. SINGH:  If I tell you that the table

19  exists and it contains that particular information,

20  that's a valid hypothetical.  You don't need anymore

21  information.  If you don't want to answer, we can meet

22  and confer and take it up with the court later.

23          MR. POULSON:  You can answer to the extent

24  you understand that question.  But you don't have to

25  assume anything as to what is in this document itself.

1   He's not asking about this document.  He's asking you

2   about something else, a document that you haven't seen

3   that is not in front of you that has this hypothetical

4   information on it and then asking you as to whether

5   that is something the plaintiff would consider

6   confidential or covered by HIPAA.  Now, if you feel as

7   a layperson, not as a lawyer, you have some --

8           MR. SINGH:  Counsel, if you have an objection

9   --

10          MR. POULSON:  That's my objection.

11          MR. SINGH:  If you want to give a talking,

12  speaking objection and further coach your witness,

13  we're going to shut this deposition down and go back to

14  the court.  This is the third time on the record you've

15  provided guidance to your client.

16          MR. POULSON:  Which is why I'm here.

17          MR. SINGH:  You're here to make objections,

18  not coach your witness.

19          THE WITNESS:  So this is the output from

20  MyMatrixx, I guess.

21  BY MR. SINGH:

22      Q.   What is MyMatrixx again?

23      A.    Internal database.

24      Q.   And NSP's internal database, it's

25  confidential information?

1        A.   Yes.

2             MR. POULSON:  Objection, vague, overbroad,

3    calls for a legal conclusion.

4    BY MR. SINGH:

5        Q.   What was your answer?

6        A.   Yes.

7             (Exhibit No. 21 marked for identification.)

8    BY MR. SINGH:

9        Q.   Exhibit 21 is an email you sent from your NSP

10   account to your personal account on June 21st, 2023.

11   Is that correct?

12       A.   Yes.

13       Q.   The subject line is "National Specialty

14   Pharmacy May 2023 Financial Statements"; correct?

15       A.   Yes.

16       Q.   And then attachments

17   "PYL_By_Class_May_2023.xlsx."  Is that correct?

18            MR. POULSON:  I'm going to object.  It's an

19   incomplete, redacted exhibit that has been altered by

20   Plaintiff's counsel.

21            THE WITNESS:  Yes.  It's the P&L.

22   BY MR. SINGH:

23       Q.   Why did you send this email to yourself on

24   June 21, 2023?

25       A.   I don't know.

1      Q.   What is a P&L?

2      A.   Profit and loss.

3      Q.   Is that a financial statement?

4      A.   Yes.

5      Q.   Are NSP's financial statements -- it's

6   confidential information?

7           MR. POULSON:  Objection, this is a document

8   that has been altered by Plaintiff's counsel, so it's

9   not asking about this document itself because it

10  doesn't contain all the information.  He's asking

11  you --

12          THE WITNESS:  In general, yes.

13          (Exhibit No. 22 marked for identification.)

14  BY MR. SINGH:

15     Q.   Do you recognize what's been marked as

16  Exhibit 22?

17          MR. POULSON:  I'm going to object again.

18  This is an incomplete document with an exhibit that's

19  been altered by Plaintiff's counsel and redacted.

20          THE WITNESS:  Yeah.  It's an email from May

21  to me.

22  BY MR. SINGH:

23     Q.   Okay.  At the top it's an email you sent from

24  your NSP account to your personal account on June 21st,

25  2023.  Is that correct?

1        A.   Yes.

2        Q.   And the heading subject line is "Report

3   2016-2017."  The attachment "PK_Report_2016-2017."

4   What's a "PK report"?

5        A.   I have no idea.  I don't know what PK stands

6   for.

7        Q.   Does it stand for prescription?

8        A.   I don't know.

9        Q.   Isn't it true that in this report May was

10  sending you on April 27, 2023 a log of all combined

11  prescriptions filled in 2016-2017?

12            MR. POULSON:  Objection, this document has

13  been altered and redacted by Plaintiff's counsel.

14            THE WITNESS:  On the header it seems, but

15  there's no content.  And I don't particularly know what

16  PK stands for.

17  BY MR. SINGH:

18       Q.   Why did you send yourself this email on

19  June 21st if you don't know what it is?

20       A.   I don't know.

21            (Exhibit No. 23 marked for identification.)

22  BY MR. SINGH:

23       Q.   Do you recognize what's been marked as

24  Exhibit 23?

25       A.   Yeah.  It says "Parkinson's menu of service

1    and common DOL meds."

2        Q.    What does that mean do you?

3        A.    DOL medications for Parkinson's.

4              MR. POULSON:    I'm going to object again.

5    This is a document that has been altered by Plaintiff's

6    counsel, heavily redacted.

7    BY MR. SINGH:

8        Q.    Is this a June 21st, 2023 email that you sent

9    from your NSP email account to your personal gmail

10   account?

11       A.    Yes.

12       Q.    And why did you send this email to yourself?

13       A.    I don't know.

14       Q.    The subject line, "Parkinson's menu of

15   services and common DOL meds," is that a reference to

16   the marketing materials referred to here in the

17   Michelle Donaldson email on April 26, 2023?

18       A.    I don't know.  I can look.  I can't see

19   anything.

20       Q.    Well, she says here, "I wanted to send out an

21   updated version of the marketing material we put

22   together for Parkinson's disease for TN and the most

23   common DOL meds that we see that are covered at the

24   higher reimbursement rate."  Do you see that?

25       A.    Yes.

1      Q.   What is Michelle referring to in that

2    sentence to the best of your understanding?

3            MR. POULSON:   Objection, calls for

4    speculation, lacks foundation.

5            THE WITNESS:   I don't know.  I can't see it

6    so I don't know.

7    BY MR. SINGH:

8      Q.   You don't see the sentence on the first page?

9      A.   No, I see the sentence.  I don't know what

10   that means.

11     Q.   You don't have any understanding of what it

12   means?

13     A.   No.

14     Q.   Yet you just emailed it to yourself anyway?

15     A.   Yes.

16            (Exhibit No. 24 marked for identification.)

17   BY MR. SINGH:

18     Q.   Do you recognize what's been marked as

19   Exhibit 24?  It's not been redacted for your benefit.

20     A.   Yeah, I can see that.

21     Q.   What is Exhibit 24?

22     A.   This is NSP's licenses on patients.

23     Q.   You sent this email to yourself from your NSP

24   account to your personal account on June 21st, 2023;

25   correct?

```
 1        A.   Correct.

 2        Q.   Why did you send this email to yourself on

 3   that date?

 4        A.   I don't know.

 5        Q.   So if there's a report where you identify

 6   where NSP has patients or doesn't have patients, would

 7   that be considered NSP's confidential information?

 8        A.   Yes.

 9             MR. POULSON:  Objection, vague, overbroad,

10   calls for a legal conclusion.

11             Please give me a second to object.

12             (Exhibit No. 25 marked for identification.)

13   BY MR. POULSON:

14        Q.   Do you recognize what's been marked as

15   Exhibit 25?

16        A.   Yes.

17        Q.   What is it?

18        A.   That's a DOE map.

19        Q.   So a DOE map that shows FWP participants by

20   state of residence.  Is that right?

21        A.   Yeah.

22        Q.   What is "FWP"?

23        A.   I don't recall what it is.

24        Q.   Is it a former worker program?

25        A.   What program?
```

1      Q.    Former worker program?

2      A.    Okay.  Could be.

3      Q.    And it was originally provided to you in this

4   lower March 7, 2023 email from Stuart Koszer.  Is that

5   right?

6      A.    Yeah.

7      Q.    And then you forwarded this email from your

8   NSP account to your personal account on June 21st,

9   2023; correct?

10     A.    Yes.  Correct.

11     Q.    Does this map identify New Mexico as a state

12   with DOE sites?

13     A.    Yes.

14     Q.    Why did you send yourself this email on

15   June 21st, 2023?

16     A.    I don't know.

17     Q.    Didn't you seek to later do business in New

18   Mexico?

19     A.    Business was dead.  There was no reason to

20   get into that business.  It was abundantly clear on

21   June 6th.

22     Q.    On June 6th?

23     A.    Yeah.  That's when I think the verdict came

24   out that they're changing the plan.  I think June 6th.

25     Q.    2023?

1        A.    2023.

2              (Exhibit No. 26 marked for identification.)

3    BY MR. SINGH:

4        Q.    Do you recognize what's been marked as

5    Exhibit 26?

6        A.    Yes.

7        Q.    What is it?

8        A.    The same thing basically.  It's a DOE map.

9        Q.    That's locations where the DOE had nuclear

10   sites?

11       A.    Yes.

12       Q.    And this is attached as part of an email you

13   sent to yourself from your NSP account to your personal

14   account on June 22nd, 2023.  Is that correct?

15       A.    Yes.

16       Q.    Why did you send yourself this email?

17       A.    I don't know.

18             (Exhibit No. 27 marked for identification.)

19   BY MR. SINGH:

20       Q.    Do you recognize what's marked as Exhibit 27?

21       A.    Yes.

22       Q.    What is Exhibit 27?

23       A.    A message from Stephen to me about what

24   questions to ask to the pharmacy.

25       Q.    You're referring to the April 30th, 2023

1    email from Stephen Drog to you.  Is that correct?

2        A.   Yes.

3        Q.   And the subject line of that email is "TN

4    Pharmacy Questions 4-30-2023"; correct?

5        A.   Yes.

6        Q.   Is this a list of questions you were to ask

7    potential pharmacy partners in Tennessee?

8        A.   Yes.

9        Q.   Then you later forward this email to yourself

10   from your NSP account to your personal account on

11   June 21st, 2023; correct?

12       A.   Yes.

13       Q.   Why did you do that?

14       A.   I don't know.

15       Q.   Who is Stephen Drog?

16       A.   He was a pharmacist in the NSP.

17       Q.   How long was Steven working at NSP?

18       A.   I don't know.  Way before me though.

19       Q.   Was he still working there when you left?

20       A.   Yes.

21            (Exhibit No. 28 marked for identification.)

22   BY MR. SINGH:

23       Q.   Do you recognize what's been marked as

24   Exhibit 28?

25       A.   Yes.

1        Q.   At the top it appears to be an email you sent

2    from your NSP account to your personal account on

3    June 21st, 2023; correct?

4        A.   Yes.

5        Q.   The subject line is "Travel/requested

6    information."  Is that right?

7        A.   Yes.

8        Q.   And then the underlying email is from Brian

9    Woods -- to May Sana, you, Brian woods on May 9, 2023?

10       A.   Yes.

11       Q.   What's the information that's being conveyed

12   in this email?

13       A.   The Tennessee pharmacies.

14       Q.   And where were these Tennessee pharmacies?

15       A.   In Tennessee.

16       Q.   But why were they being communicated?

17            MR. POULSON:  Objection, why are they being

18   communicated from Brian to the recipients in his email?

19            MR. SINGH:  Correct.

20            MR. POULSON:  Objection, calls for

21   speculation, lacks foundation.

22   BY MR. SINGH:

23       Q.   To the best of your understanding?

24       A.   The pharmacies that NSP was looking at

25   talking to.

1        Q.    So this is for potential partnership or

2    acquisition?

3        A.    Correct.

4        Q.    Why did you send yourself this email on

5    June 21st, 2023?

6        A.    I don't know.

7              (Exhibit No. 29 marked for identification.)

8    BY MR. SINGH:

9        Q.    Do you recognize what's been marked as

10   Exhibit 29?

11       A.    Yeah.

12       Q.    At the top it's an email you sent from your

13   NSP account to your personal account on June 21st,

14   2023?

15       A.    Yes.

16       Q.    The subject line is "Updated TN Sales

17   Prospects."

18       A.    Got it.

19       Q.    That refers to Tennessee sales prospects?

20       A.    Yes.

21       Q.    Brian Woods sent you the underlying email on

22   May 19, 2023; correct?

23       A.    Yes.

24       Q.    What information to the best of your

25   understanding is being conveyed in this email?

1              MR. POULSON:  Objection, lacks foundation,

2   calls for speculation.

3              THE WITNESS:  These are HHAs.

4   BY MR. SINGH:

5        Q.   What are HHAs?

6        A.   Home health agencies.

7        Q.   Why were you sending yourself this email on

8   June 21st, 2023?

9        A.   I don't know.

10             (Exhibit No. 30 marked for identification.)

11   BY MR. SINGH:

12        Q.   Did Taycann do business with any of the HHAs

13   referred to on that last exhibit.

14        A.   No.

15        Q.   Do you recognize what's been marked as

16   Exhibit 30?  And I'll represent that it is three emails

17   together.

18        A.   Uh-huh.

19        Q.   What is Exhibit 30 to the best of your

20   understanding?

21        A.   Again, these are pharmacies Brian was

22   connecting with.

23        Q.   Do you recall what the Music City Compounding

24   Pharmacy is?

25        A.   I think it was about one of the pharmacies

```
1   that Brian was talking to.

2        Q.   Who's Brian?

3        A.   Brian Woods was the person NSP hired in

4   Tennessee.

5        Q.   And then you forwarded these emails to

6   yourself on June 21st, 2023; correct?

7        A.   Yes.

8        Q.   From your NSP account to your personal gmail

9   account?

10       A.   Yes.

11       Q.   Why did you do that?

12       A.   I don't know.

13            MR. SINGH:   We've been going for about an

14   hour.   Should we do a break?

15            MR. POULSON:   Sure.

16            (Recess.)

17            (Exhibit No. 31 marked for identification.)

18   BY MR. SINGH:

19       Q.   Mr. Padhye, Do you recognize what's been

20   marked as Exhibit 31?

21       A.   Yeah.

22       Q.   What is it?

23       A.   Some pharmacy name.

24       Q.   Some pharmacy name?

25       A.   Yeah.
```

```
 1        Q.   Is this a --

 2        A.   Yeah.

 3        Q.   Is this an email you sent to yourself from

 4   your NSP account to your personal account on June 21st,

 5   2023?

 6        A.   Yes.

 7        Q.   The subject line is "Pro-compounding

 8   Pharmacy"; right?

 9        A.   Correct.

10        Q.   That's the pharmacy name you're referring to?

11        A.   Yes.

12        Q.   And what was that pharmacy to the best of

13   your recollection?

14        A.   A pharmacy in Tennessee.

15        Q.   Is this the pharmacy NSP was pursuing some

16   sort of business agreement with?

17        A.   I never made them, so I don't know.

18        Q.   Why did send yourself this email?

19        A.   I don't know.

20             (Exhibit No. 32 marked for identification.)

21   BY MR. SINGH:

22        Q.   Do you recognize what has been marked as

23   Exhibit 32?

24        A.   Yeah.

25        Q.   Is this an email you sent from your NSP
```

1    account to your personal account on June 21st, 2023?

2        A.    Yes.

3        Q.    Why did you send yourself this email?

4        A.    I don't know.

5            (Exhibit No. 33 marked for identification.)

6    BY MR. SINGH:

7        Q.    Do you recognize Exhibit 33?

8        A.    Yeah.

9        Q.    And what is Exhibit 33?

10       A.    Randy from Heartland Apothecary.

11       Q.    So this is an email you sent from your NSP

12   account to your personal account on June 21st, 2023.

13   Is that correct?

14       A.    Yes.

15       Q.    Subject line is "Randy Martin Heartland

16   Apothecary"?

17       A.    Yes.

18       Q.    Who is Randy Martin?

19       A.    I think the owner or head pharmacist of

20   Heartland.

21       Q.    Did you meet with Randy Martin?

22       A.    I think, yes.  Once.

23       Q.    What was the purpose of that meeting?

24       A.    To understand if he wants to partner or sell.

25       Q.    You ultimately forwarded this email string to

1   yourself on June 21st, 2023; correct?

2        A.   Yes.

3        Q.   Why?

4        A.   I don't know.

5             (Exhibit No. 34 marked for identification.)

6   BY MR. SINGH:

7        Q.   Do you recognize what's been marked as

8   Exhibit 34?

9        A.   Yes.

10       Q.   Is Exhibit 34 an email you sent to yourself

11  from your NSP account to your personal account on

12  June 21st, 2023?

13       A.   Yes.

14       Q.   And the subject line is "Randy Martin

15  Heartland Apothecary."  Is that right?

16       A.   Yes.

17       Q.   And the attachment includes an

18  "04_2023_P&L_Heartland.pdf."  Is that correct?

19       A.   That's correct.

20       Q.   Why did you send yourself this email on

21  June 21st, 2023?

22       A.   I don't know.

23       Q.   Did you ever attempt to acquire that pharmacy

24  from Heartland Apothecary?

25       A.   Not at all.

1           MR. POULSON:  Objection, he as him

2    personally?

3    BY MR. SINGH:

4        Q.   Did you ever personally try to acquire that

5    pharmacy?

6        A.   Not at all.

7        Q.   What about on behalf of Taycann Wellness?

8        A.   Not at all.

9        Q.   What about on behalf of NSP?

10       A.   On behalf of NSP, we tried.

11       Q.   What happened?

12       A.   He clearly says here I honestly have no

13   intention to sell my business.

14           (Exhibit No. 35 marked for identification.)

15   BY MR. SINGH:

16       Q.   Do you recognize what's been marked as

17   Exhibit 35?

18       A.   Yes, an email from Stuart to Sanjiv and I.

19       Q.   And then you later forwarded that email from

20   your NSP account to your personal email account on

21   June 21st, 2023?

22       A.   Yeah.

23       Q.   And what was the discussion in the original

24   email thread between Stuart, you and Sanjiv?

25       A.   I don't know.  I'm trying to find out if the

```
 1  records show.  Stuart is asking McKesson to recommend
 2  pharmacies to acquire.
 3       Q.   Why did you send yourself this email from
 4  your NSP account to your personal account?
 5       A.   I don't know.
 6            (Exhibit No. 36 marked for identification.)
 7  BY MR. SINGH:
 8       Q.   Do you recognize what's been marked as
 9  Exhibit 36?
10       A.   Yeah.
11       Q.   Okay.  So this at the top is a June 28th,
12  2023 email from you at your gmail account to Maybelline
13  Sana at her gmail account.  Is that correct?
14       A.   Yeah.
15       Q.   And the subject line is "Sales Collateral
16  (Draft)."
17       A.   Yes.
18       Q.   What was being discussed in this email?
19       A.   That is an email to her.  Nothing is
20  discussed.  That's what it is.
21       Q.   You originally received this email that's
22  being forwarded now while you were still at NSP;
23  correct?
24       A.   Yes.
25       Q.   The original email was sent on June 19th,
```

1    2023 from Srividya to you and Naidu.  Is that correct?

2        A.   Yes.

3        Q.   And this was in relation to a sales pitch

4    from ColigoMed?

5        A.   I can't understand what that is.  Just URLs.

6        Q.   But they're from ColigoMed?

7        A.   Yes.

8        Q.   And then you forwarded this email to May Sana

9    on June 28th, 2023?

10       A.   Yeah.

11       Q.   Why did you do that?

12       A.   I don't know what's in it, so I don't know.

13       Q.   June 28th, 2023 were you working with May

14   Sana?

15       A.   No.

16       Q.   So on June 28th, 2023 you were not working

17   with May Sana towards Taycann Wellness?

18       A.   I would have to find out when she joined.  I

19   don't know the date.

20       Q.   Okay.  Would there be any reason for you to

21   send this email to her at her personal gmail account on

22   June 28th, 2023 other than for the benefit of Taycann

23   Wellness?

24            MR. POULSON:  Objection, overbroad, calls for

25   speculation.

1              THE WITNESS:  I don't know what the

2    circumstances were and what it is, what the

3    presentation is about.  I can't see it.

4    BY MR. SINGH:

5        Q.   Do you recall sending her this email?

6        A.   No.

7        Q.   What is the earliest you recall working with

8    May Sana on Taycann Wellness?

9        A.   I don't know the dates.  I don't remember.

10             (Exhibit No. 37 marked for identification.)

11   BY MR. SINGH:

12       Q.   Do you recognize what's been marked as

13   Exhibit 37?

14       A.   Yeah.

15       Q.   Is Exhibit 37 an email from you to Alexander

16   Levitan sent on June 29th, 2023, the subject line "Your

17   Business for Sale Listing Encino-ShOaksRX"?

18       A.   Yes.

19       Q.   What was the purpose of this email to Alex

20   Levitan?

21       A.   I wanted to talk to other people to

22   understand what's happening with the 503B.

23       Q.   Were you in discussions with Mr. Levitan to

24   purchase the pharmacy?

25       A.   No, he had a listing, so I called him.

1      Q.    In the email at the top you write, "Thanks

2   for your email.   I am not a licensed CA pharmacist, but

3   I have run other compounding pharmacies in Nevada and

4   Tennessee."   Which compounding pharmacies did you run

5   in Nevada?

6      A.    NSP.

7      Q.    Which compounding pharmacies did you run in

8   Tennessee?

9      A.    Neither.   No.

10     Q.    Why did you communicate to him that you

11   run -- you ran a compounding pharmacy in Tennessee?

12     A.    So at least he would talk to me and give me

13   information.

14     Q.    So did you lie to him?

15          MR. POULSON:   Objection.

16          THE WITNESS:   I'm not going to answer that.

17   BY MR. SINGH:

18     Q.    You have to answer.   Are you refusing to

19   answer?

20     A.    I didn't lie to him.   I just wanted to get

21   information.

22     Q.    But you were being untruthful when you said

23   you had run a compounding pharmacy in Tennessee;

24   correct?

25     A.    Okay.   Yeah.

1    Q.   Yes.  You then write, "I am an investor and I

2   have a team of pharmacists and sales experts."  Who

3   were your team of pharmacists?

4    A.   Nobody.  We didn't have any.  As I said, I'm

5   just trying to get information from him.

6    Q.   Okay.  So you didn't have a team of

7   pharmacists?

8    A.   No.

9    Q.   That was not truthful?

10    A.   That was not truthful.

11    Q.   Who were your sales experts?

12    A.   Nobody.

13    Q.   So that was another untrue statement?

14    A.   Yeah.

15    Q.   Do you regularly make untrue statements?

16    A.   No.

17    Q.   Just at this deposition?

18    MR. POULSON:  Oh, objection.  You don't have

19   to answer that obviously.

20   BY MR. SINGH:

21    Q.   You then write, "I'm interested in

22   establishing a compounding pharmacy in California."

23    A.   Yes.

24    Q.   Is that true?

25    A.   I was seeking information.  I said that

1  already.

2        Q.    Okay.  So you were seeking to establish a

3  compounding pharmacy in California?

4        A.    As I said, 503B is something I am trying to

5  find out.  If the retail is gone if the wholesale

6  business has any value.  And NSP was not in wholesale

7  business.

8        Q.    Sos was this an information request in

9  relation to a wholesale pharmacy?

10       A.    Yes.

11       Q.    So if you turn to the next page, it says

12  "Dear Alex Levitan, You've received a message regarding

13  your Profitable Retail Compounding Pharmacy in

14  Encino-Sherman Oaks area."

15       A.    Yeah.

16       Q.    Is retail compound pharmacy the same as

17  wholesale pharmacy?

18       A.    They could have the same license.  I am just

19  trying to establish that.

20            (Exhibit No. 38 marked for identification.)

21  BY MR. SINGH:

22       Q.    Do you recognize what's been marked as

23  Exhibit 38?

24       A.    Uh-huh.

25       Q.    Is this a July 9, 2023 email from you to

1  they don't know.  It is dropped.

2      Q.   Following that conversation, have you had any

3  other further conversations with them?

4      A.   Following that we -- yeah.  We had a lunch

5  together.

6      Q.   When?

7      A.   December.  I was there in Vegas because my

8  daughter lives there, for her birthday.  And we had

9  lunch together.

10      Q.   December of last year?

11      A.   December of last year.

12      Q.   What did you discuss at that lunch?

13      A.   Nothing.  Lunch.  Casual.

14      Q.   Did you discuss this case?

15      A.   No.  They have moved on.  I was talking about

16  her job, their jobs, what they do, kids.

17          MR. SINGH:  Okay.  No further questions now.

18  We're going to hold this deposition open.

19          MR. POULSON:  What are the questions you

20  wanted to ask that you wanted to mark?

21          MR. SINGH:  I think the court reporter marked

22  them.

23          MR. POULSON:  Well, can you ask them?

24          MR. SINGH:  I don't remember them now.

25          MR. POULSON:  Well, let's meet and confer and

1  do it now.  He's right here if you want to ask him

2  those questions.  They were pretty important.

3          MR. SINGH:  Why don't we go off the record.

4          (Recess.)

5          MR. SINGH:  Back on the record.

6      Q.   I'm going to have you go back to Exhibit 16.

7  Actually, let's go to Exhibit 17.

8      A.   16?

9      Q.   17.

10     A.   Here we go.

11     Q.   Do you remember our earlier discussion about

12  this exhibit?

13     A.   Yes.

14     Q.   Okay.  If you recall Stuart Koszer in this

15  email sent you a spreadsheet regarding NSP's non-DOL

16  compound business; right?

17     A.   Yes.

18     Q.   If you turn to the table that is redacted, if

19  that table was visible to you and it contained the

20  information it purports to contain based on the

21  headings available and information available to you,

22  would you consider that to be NSP's confidential

23  information?

24          MR. POULSON:  I'm going to object that the

25  document has been altered by Plaintiff's counsel, it

1  calls for speculative hypothetical, it lacks

2  foundation, calls for a legal conclusion.

3          THE WITNESS:  Without looking at it, maybe.

4  BY MR. SINGH:

5      Q.   Maybe?

6      A.   Yes.

7      Q.   The company is calculating its average profit

8  or total profit.  Would you consider that to be the

9  company's confidential information?

10     A.   Yes.

11         MR. POULSON:  Objection, vague and overbroad.

12  BY MR. SINGH:

13     Q.   Let's turn to Exhibit 19.

14     A.   Yes.

15     Q.   Do you recall our previous discussion

16  regarding this exhibit?

17         MR. POULSON:  Objection, vague.

18         THE WITNESS:  Yes.

19  BY MR. SINGH:

20     Q.   I want you to turn to the attachment.  And

21  I'll represent that this is a redacted exhibit.  But if

22  NSP had a table of information containing the date

23  dispensed, script number, customer name, prescriber for

24  that particular customer and the drug that particular

25  customer was prescribed, would you consider that to be

1    NSP's confidential information?

2            MR. POULSON:  Objection, calls for

3    speculation, lacks foundation, incomplete hypothetical.

4            THE WITNESS:  Yes.

5    BY MR. SINGH:

6        Q.   Let's turn to Exhibit 20.

7        A.   Yeah.

8        Q.   Let's skip that.  Sorry.  Let's go to Exhibit

9    22.

10       A.   Yes.

11       Q.   Do you recall that we previously looked at

12   Exhibit 22?

13       A.   Yes.

14       Q.   I want you to turn to the exhibit.  I'll

15   represent that it has been redacted.  The title of this

16   exhibit states "Log of scripts, combined prescriptions,

17   schedule all."  And then additional information below

18   indicates that it is "Prescriptions filled between

19   January 1st, 2016 to December 31st, 2017."

20           If NSP has a database that contains the

21   provided information regarding all prescriptions filled

22   between January 1st, 2016 to December 31st, 2017

23   including the prescription number, date dispensed, date

24   written, patient, the quantity of the drug, prescribing

25   doctor, pharmacist and totals, would you consider that

1    to be NSP's confidential information?

2              MR. POULSON:  Objection, incomplete

3    hypothetical, lacks foundation, calls for speculation.

4              THE WITNESS:  Yes.

5              MR. SINGH:  No further questions at this

6    time.

7              MR. POULSON:  I just want to note there was

8    an issue that our document production may have

9    contained attorney-client materials.  Mr. Singh raised

10   that with us.  I was having a technical issue accessing

11   those documents, but we are looking into it.  So we

12   don't want to waive the privilege, but we wanted to go

13   forward with the deposition today.  I just wanted to

14   make that note.

15             MR. SINGH:  Thank you.

16             THE REPORTER:  Did you want a copy of the

17   transcript, Mr. Poulson?

18             MR. POULSON:  Please.  Yes.

19             (Whereupon, the deposition concluded at 3:14

20   p.m.)

21

22

23

24

25

1      I do hereby declare under penalty of perjury that

2   I have read the foregoing and it is true and correct to

3   the best of my knowledge, including any corrections that

4   I have made.

5

6   Dated_____at

7   _____, California.

8

9

10  _____

11                     SAMEER PADHYE

12

13

14

15

16

17

18

19

20

21

22

23

24

25