# EXHIBIT C

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3

4

5   National Specialty            .
    Pharmacy, LLC,                .
6                                 . Civil Action No.
              Plaintiff,          . 5:23-cv-04357-PCP.
7        v.                       .
                                  . San Francisco, California
8                                 .
    Sameer Padhye, et al.,        . Thursday, December 12,
9                                 . 2024
              Defendants.         .
10                                . 9:14 a.m.
    . . . . . . . . . . . . . . .

11                          VOLUME II
12                         DEPOSITION OF

13                  SANJIV DHAWAN 30(b)(6)

14                   Taken by the Defendant

15

16

17

18

19

20

21              LATYSHA GODWIN, CER-1812
                Esquire Deposition Solutions
22

23
    Proceedings recorded by electronic sound recording;
24  Transcript produced by transcription service.

25



1                        APPEARANCES OF COUNSEL

2     On behalf of the Plaintiff, National Specialty Pharmacy,

3     LLC:

4              NITOJ SINGH, ESQ.
               DHILLON LAW GROUP
5              177 Post Street
               Suite 700
6              San Francisco, California 94108
               415-433-1700
7              nsignh@dhillonlaw.com

8
      On behalf of the Defendant, Sameer Padhye:
9
               RICHARD H. POULSON, ESQ.
10             LAW OFFICE OF RICHARD H. POULSON
               2233 Santa Clara Avenue
11             Suite 3
               Alameda, California 94501
12             510-747-8034
               rich@richardpoulsonlaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    INDEX TO EXAMINATION

 2

 3   EXAMINATION                                   PAGE
 4     Examination by Mr. Poulson                  66

 5

 6

 7

 8                    INDEX OF EXHIBITS

 9   DEFENDANTS'            DESCRIPTION            PAGE
10   Exhibit  6      List                          67
11   Exhibit  7      Texts                         95
12   Exhibit  8      Texts                        115
13   Exhibit  9      E-mail                       121
14   Exhibit  10     E-mail                       126
15   Exhibit  11     E-mail                       131
16   Exhibit  12     E-mail                       137
17   Exhibit  13     E-mail                       142
18   Exhibit  14     E-mail                       146
19   Exhibit  15     E-mail                       147
20   Exhibit  16     E-mail                       150
21   Exhibit  17     E-mail                       155
22   Exhibit  18     E-mail                       160
23   Exhibit  19     E-mail                       169
24   Exhibit  20     E-mail                       173
25   Exhibit  21     E-mail                       186
```



1                  INDEX OF EXHIBITS (CONTINUED)

2    Exhibit  22    E-mail                                    194

3    Exhibit  23    E-mail                                    198

4    Exhibit  24    E-mail                                    202

5    Exhibit  25    Account activities                        204

6    Exhibit  26    Account activities                        210

7    Exhibit  27    Account activities                        217

8    Exhibit  28    Marketing Artifacts Production            219

9    Exhibit  29    LV Accounts                               221

10   Exhibit  30    Marketing Events Analytics                224

11   Exhibit  31    Marketing Artifacts Creation              227

12   Exhibit  32    Master DOE Patient List                   229

13   Exhibit  33    Second Amended Complaint                  234

14   Exhibit  34    At Will Employment Exhibit 1              235

15   Exhibit  35    At Will Employment Exhibit 2              261

16   Exhibit  36    At Will Employment Exhibit 3              264

17

18        (Exhibits 6 through 36 are attached to the original

19   transcript.)

20

21

22

23

24

25



```
 1              THE RECORDER:  We are now on the record at
 2    9:14 a.m., Pacific Time, on December 12th, 2024, to take
 3    the deposition of Sanjiv Dhawan in the case of -- Sanjiv
 4    Dhawan as the corporate representative and -- in the
 5    case of National Specialty Pharmacy versus Sameer
 6    Padhye.
 7              My name is Latysha Godwin, notary public in
 8    the state of California.  I will be capturing the
 9    verbatim record of today's proceeding using electronic
10    audio equipment, a computer, and specialized recording
11    software, which is not a form of stenography.
12              The witness is located in San Francisco and
13    has confirmed their identity with a driver's license
14    issued by the DMV.
15              Will everyone in attendance please identify
16    yourselves for the record and state who you represent.
17              MR. POULSON:  Rich Poulson for the defendant,
18    Sameer Padhye.
19              MR. SINGH:  Nitoj Singh for plaintiff,
20    National Specialty Pharmacy.
21              MR. DHAWAN:  Sanjiv Dhawan for National
22    Specialty Pharmacy.
23              THE RECORDER:  Absent any objection at this
24    time, counsel and the witness agree to my administration
25    of the oath to this witness and that the final
```



1   to market to patients, providers.

2   Q.   And when was it used for that purpose?

3   A.   When monday.com was accessed by Mr. Padhye on a

4   number of occasions after his resignation.

5   Q.   Okay.  So -- I'm sorry.  So he misused the trade

6   secrets from the PK database when he accessed

7   monday.com?

8   A.   No, sir.  You asked me if he misused any trade

9   secrets, and I said in the general sense he -- when he

10  accessed monday.com and when he sent PK reports to his

11  personal e-mail, that was improper access.

12  Q.   Okay.

13  A.   Mr. Padhye -- Mr. Padhye took a HIPAA course --

14  Q.   Right.

15  A.   -- and certification prior to his beginning

16  employment.

17  Q.   Right.

18  A.   He knew all of the rules that govern patient data

19  and medically identifiable information at the time he

20  sent himself these reports.

21  Q.   So why was it improper that he sent it to himself?

22  A.   It is disclosure outside of the pharmacy.

23  Q.   It's to himself.  It's not to -- okay.  Are you

24  aware of Mr. Padhye ever disclosing any of NSP's

25  trade secrets to a third party?



1   A.    No, not specifically.

2   Q.    Are you aware of Mr. Padhye ever using any of NSP's

3   trade secrets after he left NSP?

4   A.    I'm aware that he was accumulating patient data for

5   the purpose of opening a pharmacy in addition to

6   whatever other activities he was engaging in.  I assume

7   in the context of that process, he disclosed this

8   information.

9   Q.    So after he left NSP, was there any prohibition

10  against Mr. Padhye entering the pharmacy business?

11          MR. SINGH:  Objection to the extent it calls

12  for a legal conclusion.

13          THE WITNESS:  Not that I'm aware, no.

14  BY MR. POULSON:

15  Q.    Was there any problem with him entering the white

16  card business after leaving NSP?

17          MR. SINGH:  Same objection.

18          THE WITNESS:  No, sir.

19  BY MR. POULSON:

20  Q.    So why do you think he used NSP's trade secrets

21  after he left NSP?  What's the evidence of that?

22  A.    Monday.com access and sharing that information with

23  two other formal -- or former employees of NSP -- May

24  Sana, Rayne Bridges.

25  Q.    How many times did Mr. Padhye access monday.com



```
 1   after he left NSP?

 2   A.   Best of my recollection, four times.

 3   Q.   Well, we're not relying on your recollection.

 4   You're speaking on behalf of the company, so...

 5   A.   But as a company representative, reviewing

 6   monday.com --

 7   Q.   Right.

 8   A.   -- I believe he accessed it four times.

 9   Q.   Four times.  What days?

10   A.   I don't have that data.

11   Q.   You need to tell me.

12           MR. SINGH:  He can tell you what he knows.

13           MR. POULSON:  He needs to tell me --

14           MR. SINGH:  He --

15           MR. POULSON:  -- the dates.

16   BY MR. POULSON:

17   Q.   If you don't know -- do you not know?

18   A.   Not off the top of my head, no.

19   Q.   All right.

20   A.   I'd have to go back and look at the records for

21   monday.com access.

22   Q.   Right.  So how long was he on monday.com?  You're

23   unable to tell me how many times -- it's your job to

24   educate yourself as to these issues, correct?

25   A.   And I have.
```



1   Q.   You understood that?

2   A.   I have.

3   Q.   And what did you do to educate yourself as to Mr.

4   Padhye's improper access of the monday.com site?

5   A.   I reviewed the access records --

6   Q.   Okay.

7   A.   -- some time ago, but I don't have the exact dates.

8   Q.   Did you produce those access records?

9   A.   We produced the monday.com records, and we were --

10  produced the support tickets that were generated, I

11  believe.

12  Q.   Did you produced the monday.com access records that

13  reflect Mr. Padhye's improper accessing of that site

14  after he left NSP?

15  A.   I believe I did.

16  Q.   What Bates numbers are those?  It's your haystack.

17  It's your needle.  You got to show me.

18          MR. SINGH:  If you don't know the number, you

19  don't have to tell or disclose the number.  You can just

20  tell him you don't know.

21          THE WITNESS:  I don't know.

22          MR. POULSON:  All right.  We are coming back

23  on that one, though.  We're coming back on a lot.

24  BY MR. POULSON:

25  Q.   How long was the -- over how many days -- well, let



```
 1   me ask this:  When was the first time Mr. Padhye
 2   accessed the monday.com site after he left NSP?
 3   A.    I believe it was in July.
 4   Q.    How long was he on there?
 5   A.    I don't have that information.
 6   Q.    What did he do when he was on it -- in that --
 7   sorry.
 8         What did Mr. Padhye do when he accessed the
 9   monday.com site after he left NSP?
10   A.    I believe he reviewed and added information.
11   Q.    What information?
12   A.    Provider names, patient names, and marketing
13   progress.
14   Q.    He added info?
15   A.    He had access, yes.
16   Q.    No, you said he added info.
17   A.    He added comments to monday.com.
18   Q.    So he accessed it, he reviewed information, and he
19   added comments?
20   A.    If he had access and he logged in, I would assume
21   he reviewed.  I wasn't there with him when he did this.
22   Q.    Do you have any evidence of what he did while he
23   was on monday.com?
24   A.    Comments were added.  I assume they were from
25   him -- that were not from our employees.
```



```
 1   Q.   What is the evidence?  So you don't know the
 2   evidence -- you can't point to the evidence showing that
 3   Mr. Padhye accessed monday.com after he left NSP, can
 4   you?
 5            MR. SINGH:  Objection.  Misstates prior
 6   testimony.
 7            THE WITNESS:  I can.
 8   BY MR. POULSON:
 9   Q.   Okay.  What is it?
10   A.   What is the evidence?
11   Q.   Yeah.
12   A.   We have logins.
13   Q.   Where?
14   A.   They were printed out.  I have them in a database,
15   yes.
16   Q.   Can you show me?  Because I --
17   A.   I don't have them right now.
18   Q.   Okay.  I'll -- could you get them at lunch?
19   A.   I'd have to see what I can get.
20            MR. SINGH:  We don't have access to a printer.
21            THE WITNESS:  Yeah.
22            MR. SINGH:  Mr. -- just --
23            THE WITNESS:  I had -- they were hard copy.  I
24   don't have them.
25            MR. SINGH:  We produced all documents.
```



1    Q.    How do I find the access records showing that Mr.

2    Padhye improperly accessed that site after he left NSP?

3              MR. SINGH:  Objection.  Vague.

4              THE WITNESS:  You'd have to run a search for

5    password, username, I'm assuming.

6    BY MR. POULSON:

7    Q.    You don't know?  What would be the password?

8              MR. SINGH:  Objection.  Vague.

9              THE WITNESS:  I don't know what the password

10   was or what he used.

11   BY MR. POULSON:

12   Q.    So how do I --

13   A.    So the word "password" might bring up a login page.

14   You're asking me for words, terms that might --

15   BY MR. POULSON:

16   Q.    No.  I --

17   A.    -- bring up.

18   Q.    I'm not asking for words or terms that might.  I'm

19   asking for words or terms that will.

20   A.    So you're asking about access to a website?

21   Q.    Right.

22   A.    That's a generic search.  It has nothing to do with

23   any -- anything --

24   Q.    So how do you know it was Mr. Padhye that did it?

25             MR. SINGH:  Objection.  Vague.



```
1              THE WITNESS:  There were notes entered.  His

2    name was there in the -- in the monday.com records.  I'd

3    have to go back down and review those records again.

4    BY MR. POULSON:

5    Q.   So right now you can't tell me how --

6    A.   He logged in.

7    Q.   How do you know that?

8    A.   He put himself as administrator.

9    Q.   Okay.

10   A.   The support -- the support team at monday.com

11   informed us that he listed himself as administrator.

12   Q.   Okay.

13   A.   Now, those support records, we can get from

14   monday.com.  But that would reveal that he, on a number

15   of occasions, replaced himself as -- put himself in

16   place as an administrator of the app, or the

17   application.

18   Q.   Did he ever ask you to remove him as administrator

19   for the website?

20   A.   He was removed by our HR person.

21   Q.   Did he ever --

22   A.   And our marketing person.

23   Q.   Did he ever ask you to remove him as the

24   administrator of the -- for --

25   A.   No, sir.  Not me.
```



1   Q.   And that -- those trade secrets that were on the

2   monday.com site, are any of them listed in Exhibit 6?

3   A.   Yes, sir.

4   Q.   Where?

5   A.   Financial statements.

6   Q.   Could you be more specific?

7   A.   Number 1 -- Bates Control No. 15887.1.

8   Q.   Wait a moment.  So what -- what page?

9   A.   First page.

10  Q.   The one that says, National Specialty Pharmacy --

11  A.   Yes.

12  Q.   -- financial statements?

13  A.   Yeah.  I am basing my responses just on the title

14  of the documents, not knowing off the top of my head

15  what they contain.

16  Q.   So you don't even know if they contain trade

17  secrets?

18  A.   I know they -- my review of these documents -- the

19  actual documents, not this list that you're providing

20  me -- the actual documents revealed are trade secrets.

21  Yes, sir.

22  Q.   So --

23  A.   I can continue if you'd like.

24  Q.   Sure.

25  A.   There's another financial statements reference.



1   There's a compound claim example.

2   Q.   Well, I'm -- I'm looking --

3   A.   There's --

4   Q.   -- for all of the trade secrets --

5   A.   Yeah.

6   Q.   -- that you claim --

7   A.   Yeah.

8   Q.   -- Mr. Padhye misappropriated --

9   A.   Yes.

10  Q.   -- from the monday.com site.

11  A.   Right.  You didn't say that the first time.

12  Q.   I did say that.

13  A.   No, you said, what's on this list?  The patient

14  lists and the provider lists and the marketing targets,

15  those were all on monday.com.  They was -- those were

16  all accessed by Mr. Padhye after he resigned.

17  Q.   And what's your evidence of that?

18          MR. SINGH:  Objection.

19          THE WITNESS:  We just --

20          MR. SINGH:  Calls for a legal conclusion.

21          THE WITNESS:  We just -- we just -- as you

22  asked and -- and I answered that question, it's his

23  access, which can be shown with the support records of

24  monday.com.

25  BY MR. POULSON:



1    Q.    But those records show he just accessed the

2    website, correct?

3    A.    Yes.

4    Q.    What else do they show?

5    A.    That he was exposed to that information.  By

6    accessing a website, you see what's on that website.

7    And it was a list of providers, list of patients, list

8    of targets, list of markets, list of -- of strategies to

9    attack those markets and those providers and those --

10   and those patients.  So it shows our proprietary

11   marketing strategy, our proprietary patient list, and

12   our proprietary provider list.

13   Q.    But you don't know how long he was on that website,

14   what day he was on that website?

15   A.    I'm sure we can find that out from monday.com.

16   Q.    But you don't know sitting here?  On behalf of NSP,

17   you don't know?

18   A.    I can't give you a specific date off the top of my

19   head, no.

20   Q.    Are there any -- so are there any documents or

21   files listed on Exhibit 6 that you claim Mr. Padhye

22   inappropriately accessed through monday.com?

23          MR. SINGH:  Objection.  Vague.  Calls for

24   legal conclusion.

25          THE WITNESS:  Can you please repeat that



```
 1  question?
 2          MR. POULSON:  Could you repeat it?
 3          THE RECORDER:  Give me one moment.  I'll queue
 4  that up.
 5      (The previous question was played back.)
 6          THE WITNESS:  Yes.
 7  BY MR. POULSON:
 8  Q.  Which ones?
 9  A.  My recollection of reviewing these documents was
10  the patient list and a provider list.  I don't know
11  which ones of these -- these are simply titles.  I don't
12  know which ones of these.  Some of them are listed as,
13  attached image, some are dot-PDF, some are -- I don't --
14  I don't -- I can't memorize a title and -- associated
15  when you give me a list of this many documents.
16  Q.  So you're saying yes, but you're saying no?
17  A.  I'm saying --
18  Q.  So you don't know?
19  A.  No, I'm saying yes.  You asked me --
20  Q.  Yes, but you don't know which ones?
21  A.  If you show me the documents, I can tell you.
22  Q.  But why do you say yes if you don't even know?
23  A.  There's a patient list I reviewed.  If this is a
24  master list of all documents that were provided to you
25  yesterday and those are the documents I reviewed --
```



 1  things that were happening at Taycan and that they were

 2  possibly happening at the time that he was employed.

 3  Q.   So it was after he had left NSP?

 4  A.   Yes.

 5  Q.   So you're not aware of any damages or costs that

 6  NSP incurred as a result of that breach?

 7  A.   We closed --

 8          MR. SINGH:  Objection.

 9          THE WITNESS:  Sorry.

10          MR. SINGH:  Calls for a legal conclusion.

11          THE WITNESS:  It caused us to close.

12  BY MR. POULSON:

13  Q.   But at the time he left, you were still giving him

14  a chance?

15  A.   At the time he resigned --

16  Q.   Right.

17  A.   -- I was going to see if he could continue -- he

18  could produce the business that he had -- he and I had

19  discussed over and over again, including before he

20  joined.

21  Q.   Sure.  Okay.  You also have a claim for tortious

22  interference against Mr. Padhye -- tortious interference

23  with a contract.

24      What contracts did Mr. Padhye tortuously interfere

25  with?



 1          MR. SINGH:  Objection to the extent it calls

 2    for a legal conclusion.

 3          THE WITNESS:  The -- the contracts that we had

 4    with our providers -- not contracts -- agreements we had

 5    with our providers to provide us with patients.

 6    BY MR. POULSON:

 7    Q.   Okay.  Hold on.  So you know in your complaint, it

 8    states in Paragraph 104 -- you can take a look.

 9    A.   Yeah.

10    Q.   It says, Padhye intentionally recruited and

11    instigated Sana, Bridges, and Brown to resign from NSP

12    and instead work at Taycan Wellness, a direct competitor

13    to NSP founded by Padhye.  But you're not referring to

14    that?

15    A.   I'm -- let me finish.

16    Q.   Yeah.

17    A.   You interrupted me.

18    Q.   Okay.

19    A.   So I had employment agreements with all of these

20    employees that he was also talking to.  That's

21    interference with my -- with NSP's contract of

22    employment with May -- May Sana, Rayne Bridges, and

23    Daniel Brown.

24    Q.   But no one breached those contracts?

25    A.   He interfered with those contracts.  What did --



1  yeah, that's a legal conclusion.  What's tortious

2  interference?

3  Q.    Right.  I mean, they could leave at any time,

4  right?

5  A.    He solicited them to leave.  Yeah.

6  Q.    So it's not that they left; it's just -- it's why

7  they left that bothers you?  If they had left for

8  another reason, then you wouldn't be concerned, but

9  because they left to go to him, that bothers you?

10  A.    It's because he solicited them to go to him.

11  Q.    So it's not them leaving; it's him soliciting them?

12  A.    It's at-will.  They can leave --

13  Q.    Right.

14  A.    -- for any reason or no reason.

15  Q.    Right.  So he --

16  A.    But he interfered with my contract with them.

17  Q.    Because they left?

18  A.    Because he solicited them.

19  Q.    Because they left?  I mean, if they hadn't left --

20  if he solicited with them and they didn't leave, would

21  there be a breach?

22  A.    The solicitation provision is pretty clear.  That

23  doesn't require them to leave.

24  Q.    I'm talking about tortious interference.

25  Non-solicitation provision, it's -- it's unenforceable



1  in California, so I'm not worried about that.

2  A.   Okay.  But the --

3  Q.   Okay.  So I'm talking about the tortious

4  interference.

5           MR. SINGH:  That's not a question.

6           MR. POULSON:  Yeah.  No, it's --

7           MR. SINGH:  You're making a comment.

8           MR. POULSON:  Right.  It's not a question.

9  It's a fact.

10  BY MR. POULSON:

11  Q.   So the tortious interference with the contract, I'm

12  trying to understand, what contracts are you talking

13  about?  You mentioned those three employment contracts.

14  But they can leave regardless, so no one breached the

15  contract.  He didn't encourage anyone to breach a

16  contract, did he?

17           MR. SINGH:  If you have a question, you can

18  ask it.  I --

19           MR. POULSON:  I just asked, did he?

20           MR. SINGH:  You're making arguments --

21           MR. POULSON:  Did he --

22           MR. SINGH:  -- and then there's the question

23  that follows.  So you can just stick to the questions if

24  you want to move this along.

25  BY MR. POULSON:



```
 1   Q.   Did he --

 2   A.   Did he what?

 3   Q.   Did he tortuously interfere with anyone's contract

 4   with NSP?

 5   A.   That's a legal conclusion.

 6          MR. SINGH:  Objection.  Calls for a legal

 7   conclusion.

 8   BY MR. POULSON:

 9   Q.   No, it's a -- it's a claim.

10   A.   It is a legal conclusion.  Give me a --

11   Q.   What facts do you have --

12   A.   Ask me -- if you ask me --

13   Q.   -- that he did anything?  Well, did he -- did he --

14   did he interfere in any way with any of NSP's contracts?

15          MR. SINGH:  Objection.  Overbroad.

16   BY MR. POULSON:

17   Q.   And if so --

18          MR. SINGH:  Calls for a legal conclusion.

19   BY MR. POULSON:

20   Q.   -- which ones, and how did he do it, and what's

21   your evidence of it?

22          MR. SINGH:  Objection.  Compound.

23   BY MR. POULSON:

24   Q.   And how did --

25          THE RECORDER:  I need you guys to speak one a
```



 1  time.

 2  BY MR. POULSON:

 3  Q.   Did he interfere with any of NSP's contracts?

 4          MR. SINGH:  Objection.  Calls for a legal

 5  conclusion and overbroad.

 6          THE WITNESS:  He solicited existing employees.

 7  BY MR. POULSON:

 8  Q.   Okay.  Other than that?

 9  A.   He contacted providers.

10  Q.   What providers?

11  A.   He contacted a physician, Dr. Capobianco.

12  Q.   Who is that?

13  A.   He was one of our main providers.

14  Q.   And so how did that interfere with your

15  relationship with him?

16  A.   He provided us with 900 patients.

17  Q.   Right.  So --

18  A.   And he referred 900 patients to us.

19  Q.   Okay.

20  A.   Dr. Capobianco let me know that he was contacted by

21  Sameer.  I don't know what the -- it was following his

22  employment.

23  Q.   But how did that interfere with your relationship

24  with this doctor?  That's what I don't understand.  He

25  just contacted one of your providers?



```
 1   A.   Yeah.
 2   Q.   Well, how did he interfere with your relationship,
 3   contractual or otherwise, with that --
 4   A.   I don't know --
 5   Q.   Okay.
 6   A.   -- beyond that.
 7   Q.   All right.  So the only three contracts that you're
 8   claiming Mr. Padhye interfered with are the employment
 9   contracts, correct?
10   A.   Yes.  We don't have contracts with providers.  We
11   have agreements with providers.  They're not -- they're
12   not written agreements.  They're --
13   Q.   Contracts don't have to be written, but it doesn't
14   matter.
15        But are you -- you attached Daniel Brown's contract
16   to the complaint; are you aware of that?
17   A.   I attached Daniel Brown's contract to the
18   complaint.
19   Q.   Correct, as an exhibit.  Are you -- are you aware
20   of Mr. Padhye ever seeing or being aware of any other
21   employee's employment contracts with NSP?
22   A.   I don't know that.
23   Q.   Okay.  When you found out that Mr. Brown was
24   conducting work for Taycan, did you instruct him to
25   stop?
```

