# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL SPECIALTY PHARMACY LLC.,

Plaintiff,

vs.

SAMEER PADHYE, an individual; BENJAMIN D. BROWN, an individual; and DOES 1 to 40, inclusive,

Defendants,

______________________________/

CASE NO. 5:23-cv-4357-PCP

DEPOSITION OF BENJAMIN D. BROWN

LAS VEGAS, NEVADA

FRIDAY, NOVEMBER 8, 2024

Reported by: KENDALL KING-HEATH

NV. CCR No. 475, CA. CSR No. 11861

Job No.: 1276027 NV Firm No.: 108F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL SPECIALTY PHARMACY LLC.,

Plaintiff,

vs.

CASE NO. 5:23-cv-4357-PCP

SAMEER PADHYE, an individual; BENJAMIN D. BROWN, an individual; and DOES 1 to 40, inclusive,

Defendants,

________________________________/

DEPOSITION of BENJAMIN D. BROWN, taken on behalf of Plaintiff, at Regus - NV Las Vegas, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada, on Friday, November 8, 2024, at 10:03 a.m. taken before Kendall King-Heath, Certified Court Reporter, NV Cert No. 475, and CA Cert No. 11861.

APPEARANCES OF COUNSEL:

For the Plaintiff:

NITOJ P. SINGH, ESQ.
DHILLON LAW GROUP, INC.
177 Post Street
Suite 700
San Francisco, California 94108
(415) 533-1700
nsingh@dhillonlaw.com

For the Defendant
Benjamin D. Brown:

In Pro Per

INDEX

EXAMINATION

| WITNESS | PAGE |
|---|---|
| BENJAMIN D. BROWN | |
| By Mr. Singh ........................ | 6 |

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Responses to Plaintiff's First Set of Interrogatories | 51 |
| Exhibit 2 | E-mail from Marisa Ruth sending request for interview with NSP, December 31, 2022 | 56 |
| Exhibit 3 | Offer letter, terms of employment, January 11, 2023 | 57 |
| Exhibit 4 | At-will employment, confidential information and invention assignment agreement | 58 |
| Exhibit 5 | Log-in information for NPS's account | 60 |
| Exhibit 6 | E-mail from Sameer explaining Taycann Wellness business model | 61 |
| Exhibit 7 | Taycann Wellness logos | 63 |
| Exhibit 8 | E-mail from Sameer about 6:00 p.m. call about logo | 64 |
| Exhibit 9 | Flyer explaining Taycann Wellness business model or offering to be distributed to doctors offices | 65 |

EXHIBITS (Cont'd)

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 10 | Taycann Wellness multifold | 66 |
| Exhibit 11 | E-mail from May about changing the photo of doctor in multifold, August 2, 2023 | 67 |
| Exhibit 12 | Medicare marketing laws and information | 69 |
| Exhibit 13 | Update e-mail on the Taycann Wellness materials | 69 |
| Exhibit 14 | E-mail discussion about building mock-up for website, August 4, 2023 | 71 |
| Exhibit 15 | E-mail from Sameer review on the website mock-up, August 7, 2023 | 72 |
| Exhibit 16 | E-mail from Rayne asking to do some marketing materials for a side business, August 7, 2023 | 74 |
| Exhibit 17 | Remote Patient Monitoring calculator | 75 |
| Exhibit 18 | E-mail ending relationship with Sameer, May and Rayne, and Taycann Wellness, August 10, 2023 | 76 |
| Exhibit 19 | E-mail from B. Brown to get more information about Taycann Wellness and white card program, as requested by Sanjiv, August 10, 2023 | 78 |
| Exhibit 20 | E-mail from Maybelline Sana in response to e-mail sent on August 10, 2023 | 80 |
| Exhibit 21 | Information provided to me by Sameer about Taycann Wellness | 82 |

Las Vegas, Nevada
Friday, November 8, 2024
-- o0o --

Thereupon,

BENJAMIN D. BROWN,

called as a witness by the Plaintiff was administered an oath and was examined and testified as follows:

EXAMINATION

BY MR. SINGH:

Q Good morning, Mr. Brown. Would you state your full name and address for the record, please.

A Benjamin Daniel Brown, Jr., 2858 Cabrillo Terrace Street, Henderson, Nevada 89044.

Q Have you had your deposition taken before?

A No, sir.

Q So, as you can see, there's a court reporter here. The court reporter will be transcribing all of your answers. So it's important that you speak evenly and in a measured pace so the court reporter is able to transcribe everything.

right thing to do. That conversation I told him about Taycann Wellness, T-a-y-c-a-n-n, how they were a remote patient monitoring company and there was no white card competition in that business model, and I agreed to do work for them. He asked me to send files of all the work I done. I put it in a Dropbox link and sent it to him. I have the active Dropbox link. I talked about the remote patient care business model. He says okay, good.

The next day -- it's detailed in my answer -- he asked me, he goes, I want you to be my mole. I said, Okay. What do you need?

I want you to contact them and ask them what their plan is with the white card patient. Cool. I sent them an e-mail, in my answer asking for further information. They said, Okay. When you leave NSP, we'd be happy to talk to you about employment. I said okay. I continued to work for NSP.

Sanjiv threatened me again, called me into his office yelling and screaming at the top of his lungs. "I should sue you and make you spend all your money defending yourself, but I'm not going to do it because you're a nice guy."

I continued to work for him -- I almost quit that day on the spot. Again, this is detailed in my answer. So for the next three hours, I almost quit three separate times.

10:53:02 I asked two days off, which I was granted through Michelle Donaldson and Jamie Stevens.

Jamie took over May's responsibilities after she left, HR-wise. So I took the two days 10:53:19 off, Thursday and Friday of that week. I was either going to give my two weeks -- work to the end of the month or just find a new job.

Then I got a message on Slack, which is a messaging software, and Sanjiv said that I have 10:53:40 to respond to him during working hours, even though I was at home on vacation. And then I decided at that point I can't put up with this anymore, then I quit as outlined in my answer.

Q So was it your understanding that 10:54:07 Taycann was or was not going after white card patients?

A As it was originally explained to me, Taycann Wellness was remote patient care only. So I created marketing materials focusing on 10:54:25 remote patient care only.

The final meeting I had with them -- these were Google Meets -- they discussed, okay, now we're going to do white card patients. And I said, What? Because it was never brought up before that point.

They said, Yes. We're going to partner with a pharmacy in New Mexico and do white card patients. So that was at the end of the meeting.

This pissed me off because there was no information before that moment about white card patients. And I could not work for a competing business while employed with NSP.

So that night I actually got into a fight with any girlfriend because I was angry about it, that it felt like this was potentially a plan to do white card patients, then I was told at the last second about it.

I ceased my relationship with them. I sent an e-mail, which is included in the answer, that to May and Sameer that I can't move forward because this is a violation of my employment agreement to work for a competing business, and that was it.

The next day Sanjiv called me, as I just mentioned a few minutes ago, asked me if I

 knew anything about or had any contact with Sameer or May and I said I had. That's when he threatened me the first time. And I sent all the information, acted as his mole, et cetera, all outlined in my answer.

Q Did they tell you which pharmacy in New Mexico they were going to partner with?

A No, sir. All they said, "We're going to partner with a pharmacy in New Mexico and do white card patients." That was it. No further information beyond that.

Q Who was present for that call?

A May, Rayne, Sameer and myself.

Q Who actually said they were going to pursue this white card with a New Mexico pharmacy?

A It was May or Sameer; I don't recall which one.

Q What's your understanding of how Taycann Wellness was structured hierarchically? Was there someone at the top there?

A I could guess at that, but I don't know. I was working on business cards, and one of the meetings it was discussed whether to put titles on business cards. And Sameer said, as a

start-up, we shouldn't put titles, just names.

As far as any structure beyond Sameer being the owner, quote/unquote owner, I have no clue.

10:57:34 Q Who told you that Sameer was the owner of Taycann Wellness?

A No one told me. I just was my assumption. If there was anybody else involved, I don't have any information on that.

10:57:49 Q Other than Sameer, Rayne and May, you don't know if anybody else was involved in Taycann Wellness?

A No.

Q Who first approached you about Taycann

10:57:59 Wellness?

A I had a couple of phone calls with Sameer when he was talking about starting a new business. I'd been laid off with Lessen, as I talked about earlier, and being laid off is not a

10:58:18 fun experience. So when he told me the business was in trouble, was immediately looking where's my next opportunity if I get laid off again.

So when he said I'm starting a new company also in marketing, maybe I'll lay

10:58:38 somewhere. He was the first one to talk to me

about that. When he described the business model, it was remote patient care. There was no mention of white card patients at all.

Q Did you have any discussions with May as to what the Taycann Wellness business model would be?

A Beyond the Google Meets and being remote patient monitoring, no. Most of my discussions about the business were with Sameer, if not at all.

Q Did you have any discussions about the business with Rayne?

A No. 90 percent of the communication was with Sameer, and that included the meetings. During the meetings, May and Rayne didn't talk that much. It was mostly Sameer talking and me responding.

Q Did that lead you to conclude that Sameer was sort of head-honcho over at Taycann Wellness?

A Yes.

Q And Sameer originally told you he was finding the business; correctYes.

A His words were I'm going to start a new company. I'm not sure what it is yet. That was

you how they planned to implement remote patient model?

A The only thing I was told is they would partner with a doctor's office and tell them about the services. Beyond that, there was no discussion of it.

Q Did you have an understanding as to whether Taycann Wellness itself had the infrastructure to offer remote patient monitoring?

A No clue, no idea.

Q What was your understanding of how they were going to offer those services?

A I was not told directly, but my guess would be they would have a call center, or they would have nurses or other licensed healthcare providers.

When I say "provider," I mean a doctor or nurse, et cetera, who would coach or train the staff to take the calls. Much like NSP had pharmacy techs who would call the patients and discuss things with them.

And the reason I know that is walking through the pharmacy, I would see them on the phone with patients saying something like, Hi Mr

or Mrs. so and so, this is so and so from NSP. But how they would provide that was never discussed with me directly.

How Taycann would provide the remote patient monitoring to as far as who would be the one doing the phone call was never discussed with me.

(Plaintiff's Exhibit 7 was marked for identification.)

BY MR. SINGH:

Q You recognize what has been marked as Exhibit 7?

A Yes, sir.

Q What is it?

A These are Taycann Wellness logos I put together.

Q Who asked you to design these logos?

A Sameer/May.

Q They asked you to produce these logos via text message or e-mail? How was the instruction communicated?

A So I created these in Adobe Illustrator, then I e-mailed them to mostly Sameer. Sameer and May had access, and we would review them in the meeting.

Q How did they give you the instruction to create these logos?

A We need a logo.

Q Was that done through person or Google Meet?

11:36:06

A I think it was the first Google Meet. They said as their first few things we need, one of them is a logo. In my marketing career, I've created countless logos. Starting a new company venture, logo is one of the first things you do on the marketing side.

11:36:27

(Plaintiff's Exhibit 8 was marked for identification.)

BY MR. SINGH:

11:36:53

Q Take a look at what's being marked as Exhibit 8. Do you recognize what's marked as Exhibit 8?

A Yes.

Q What is it?

11:37:00

A It's an e-mail from Sameer to myself about the 6:00 p.m. call about the logo.

Q This is a logo for Taycann Wellness?

A Yes, sir.

Q In this e-mail thread, May and Rayne are not copied; correct?

11:37:26

A Yes. Some of the e-mails were directly between Sameer and myself. May was involved, and Rayne to a lesser extent. I would say Rayne's involvement in these and the decision-making was 20 percent. It was mostly Sameer and me.

(Plaintiff's Exhibit 9 was marked for identification.)

BY MR. SINGH:

Q Take a look at what's being marked as Exhibit 9. What is Exhibit 9?

A This is a flyer I designed that would be e-mailed to potential doctors offices, kind of explaining the Taycann Wellness business model or offering.

Q Who asked you to design this flyer?

A Sameer.

Q Who gave you the content for the flyer?

A Sameer.

Q So if we take a look at the first page under the heading Remote Patient Monitoring, Sameer provided you with the content that follows?

A Yes.

Q Under the heading Chronic Care

Monitoring, that was also Sameer?

A Yes, sir.

Q And How it Works, was that also Sameer?

A Yes, sir.

Q Would you say the same generally is true for the second page of the flyer, Prior Quality Healthcare?

A Yes.

Q What is your input in this flyer that Sameer provided you?

A Layout and design, finding the stock photo of the doctor, adding the logo, laying it out.

(Plaintiff's Exhibit 10 was marked for identification.)

BY MR. SINGH:

Q Take a look at what's being marked as Exhibit 10. What's your understanding of what Exhibit 10 is?

A This is the Taycann Wellness multifold.

Q The top it's an e-mail from you to Mr. Padhye August 1st, 2023; correct?

A Yes.

 Q You sent Mr. Padhye this multifold?
A Yes.
Q Who created this multifold?
A I did.
11:41:02 Q Did you come up with the content of the multifold?
A The text was -- the layout and the design was me. The text was supplied by Sameer.
11:41:18 Q So on the first page of multifold there's a heading that says we provide quality remote care for your patients.
Is it your testimony that the content that follows the text was all provided by Mr.
11:41:37 Padhye?
A Yes.
Q Even on page 2, the text that follows all the headings, that was also provided by Mr. Padhye?
11:41:44 A Yes.
(Plaintiff's Exhibit 11 was marked for identification.)
BY MR. SINGH:
Q Take a look at what's being marked as
11:42:22 Exhibit 11. What is Exhibit 11?

A It's an e-mail from May about changing the photo of the doctor because he had a chain around his neck.

Q Mr. Padhye isn't copied on this e-mail thread; correct?

A Correct.

Q Was Mr. Padhye involved in these discussions?

A This particular one, no, but it was a small change. But he was involved in 99.9 percent of all discussions I had. I think this might have been the only one.

Q Did Ms. Sana provide any input to the text of any of the marketing material you were asked to provide?

A She mentioned something about you can't have some certain words in healthcare marketing, so there was an edit to mention any cost or savings.

Q Did Ms. Bridges provide any input to the marketing materials you were providing?

A No, sir. Feedback, yes. No input.

Q Did Ms. Bridges provide any of the content?

A No.

(Plaintiff's Exhibit 12 was marked for identification.)

BY MR. SINGH:

Q Take a look at has been marked as Exhibit 12. Do you recognize Exhibit 12?

A Yes.

Q What is Exhibit 12?

A These are Medicare marketing laws and information about these laws that May sent me.

Q Did you have a discussion with May about these laws?

A Beyond -- I read these, that was about it.

Q Did you discuss these marketing laws with Mr. Padhye?

A I use these as a guideline to make sure when we created any materials, it wouldn't violate any of these. Beyond that, I don't recall any discussions with anyone. I pretty much read them and that was it.

(Plaintiff's Exhibit 13 was marked for identification.)

BY MR. SINGH:

Q Do you recognize what's being marked as Exhibit 13?

A Yes.
Q What's Exhibit 13?
A It's an update e-mail on the Taycann Wellness materials.
11:46:16 Q So the e-mail references a website mock-up that's created?
A Yes. The mock-up was done in PDF as discussed. No website. No live website was created.
11:46:33 Q Then there's the revised PDF and multifold done. Do you see that?
A Yes.
Q Were those of the multifolds and others that we looked at today?
11:46:49 A Yes. The PDF is the doctor with the chain on his neck and the multifold was the other multi-image piece.
Q At the bottom of the e-mail you reference creating business cards?
11:47:01 A Yes.
Q Were those business cards created?
A The mock-ups were created, but as far as getting them printed or anything, I don't have any information on that.
11:47:13 Q With the mock-ups you created, I think

it was your testimony there's no title for any of these individuals; is that correct?

A There were titles discuss originally. I don't recall -- I think I asked if people should have titles on these, and that's when Sameer says, As a startup, we generally don't put titles on in the beginning stages.

Q You mentioned that titles were discussed. Were any particular titles for any individuals or just the general concept of titles?

A General concept of titles.

(Plaintiff's Exhibit 14 was marked for identification.)

BY MR. SINGH:

Q Do you recognize what's marked as Exhibit 14?

A Yes.

Q What is Exhibit 14?

A This is a discussion about building the mock-up for the website.

Q Ms. Bridges and Ms. Sana were not copied on this e-mail thread; correct?

A Correct.

Q But they were copied on this first

thread. That's what we looked at?

A I don't know if it's the first thread. There were times when he would e-mail me directly, and there were times when other people would be added.

Q When you say he would e-mail you directly, you're Mr. Padhye?

A Sameer. There were times when Sameer would e-mail me directly, and other times Rayne and May would be added on to the e-mail chain.

(Plaintiff's Exhibit 15 was marked for identification.)

BY MR. SINGH:

Q Take a look at what is being marked as Exhibit 15. Do you recognize Exhibit 15?

A Yes.

Q What is Exhibit 15?

A I think it's a review on the website. Yes, it's a review on the website mock-up.

Q This is for Taycann Wellness?

A Yes.

Q I want to direct your attention to that first paragraph on the top of the e-mail. About four lines down Mr. Padhye writes, "For example, instead of enroll now, we should say register to

see a demo." Do you see that?

A Yes.

Q The following sentence says, "The process is a few steps before we can enroll them as a customer."

What's your understanding of why Mr. Padhye wanted this changed?

A I don't understand. I don't know why.

Q Did you discuss this on the phone with him?

A I don't recall, I don't think so. Usually when you design a website, there's a call to action -- buy now, learn more.

The Enroll Now was the call to action. As far as other steps beyond that, I'm not aware.

Q Right above the sentence we just talked about. Mr. Padhye wrote, Few minor recommendations, we can discuss over the phone tomorrow.

To the best of your recollection, did you discuss the following change about enroll now versus register during that phone call?

A Don't recall specifically. As far as any process involved in enrolling, I have no

         information on that.

Q What's your understanding of who the customers of Taycann Wellness were?

A Doctors offices.

11:52:33 (Plaintiff's Exhibit 16 was marked for identification.)

BY MR. SINGH:

Q Do you recognize what's marked as Exhibit 16?

11:52:36 A Yes.

Q What is it?

A This is Rayne asking me to do some marketing materials for a side business that she had.

11:52:49 Q What's your understanding of what that side business was?

A Beyond what's written here in the e-mail, it says, "Consulting for providers and pharmacies to help grow their practices."

11:53:08 This was the only communication we had in regards to this.

Q Did you provide any work-product for her side business?

A No, sir.

11:53:21 Q Did you have any discussions with her

concerning providing work-product for her side business?

A No, sir, not beyond what's listed here.

(Plaintiff's Exhibit 17 was marked for identification.)

11:53:44

BY MR. SINGH:

Q Do you recognize what's being marked as Exhibit 17?

A It's an RPM calculator. I think Remote Patient Monitoring calculator.

11:54:15

Q This is an e-mail where May Sana sent you this RPM calculator in August 2023?

A Yes.

Q There's a link there that directs you to Renounce, P-r-e-v-o-u-n-c-e.com domain. Do you see that with additional text thereafter?

11:54:38

A Yes.

Q What is Prevounce.com?

A I don't really know. She sent me this link. I think I clicked on it for one or two seconds, and I couldn't tell you anymore than. I don't know anymore information about it than that.

11:55:18

Q Do you recall what you saw when you clicked on the link?

11:55:33

A No.

Q Did you have any further discussions with Maybelline Sana regarding this RPM calculator?

11:55:44 A No.

Q Had you any discussions prior to this e-mail being sent regarding this RPM calculator?

A No.

11:55:54 Q So she just sent you out this out of the blue?

A I think so. If there were discussions, it might have been in the meeting and said, I'll send you this, but I don't recall much about this

11:56:05 at all.

Q Do you have any understanding as to the objective of an RPM calculator generally?

A No.

(Plaintiff's Exhibit 18 was

11:56:39 marked for identification.)

BY MR. SINGH:

Q Do you recognize what is marked as Exhibit 18?

A Yes.

11:56:56 Q What is it?

A This is an e-mail ending my relationship with Sameer, May and Rayne, and Taycann Wellness, describing that I thought the business was just remote care. But they -- in the final meeting at the end of the final meeting when they mentioned "white card patients as previously mentioned, I said I can't move forward because it's a violation of my work agreement to consult with a competing business.

11:57:21

11:57:40

Q So you sent this e-mail to Mr. Padhye and Ms. Sana on August 10; correct?

A Yes, sir.

Q Any reason you didn't copy Ms. Bridges on this e-mail?

11:57:50

A She wasn't one of the main people I would say. My understanding, this is Sameer, and a lesser extent May, who was running the ship, and Rayne to a much lesser extent.

Q So you write in this e-mail, "But when I found out on Monday night that white card patients would be a part of it, I just can't move forward." Do you see that?

11:58:17

A Yes, sir.

Q So is that the Monday might immediately preceding this e-mail?

11:58:33

A Yes.

Q Safe to say that that meeting where they told you about the white card program was on the evening of August 7, 2023?

11:58:42 A If that's the Monday, yes. Thursday would be the 10th, Wednesday would be the 9th, Tuesday would be the 8th. Yes, Monday the 7th, sorry.

Q Just to confirm, this was the Google 11:59:05 Meet we previously talked about where they informed you of their plans to partner with the New Mexico pharmacy?

A Yes.

Q Other than working with the New Mexico 11:59:29 pharmacy, did they describe how they would be seeking white card business?

A No.

Q Did they tell you that they were going to approach white card patients solely for 11:59:46 chronic care management or remote patient monitoring?

A No.

(Plaintiff's Exhibit 19 was marked for identification.)

12:00:18 BY MR. SINGH:

Q You recognize what's being marked as Exhibit 19?
A Yes.
Q What is Exhibit 19?
12:00:24 A It's an e-mail that Sanjiv asked me to send in an effort to get more information about Taycann Wellness and their plans for white card patients.
Q This was sent the day after the last
12:00:45 e-mail we discussed, right, where you advised Sameer and May that you couldn't move forward with Taycann Wellness?
A Yes.
Q Other than the e-mail we previously
12:01:00 discussed from Maybelline Sana, did you have any other response from this e-mail?
A No.
Q Did Mr. Padhye respond at all to you in this e-mail?
12:01:13 A No.
Q And that's in any capacity, via text or phone call, anything?
A After I sent the e-mail, Sameer called me two or three times, and I blocked his number.
12:01:33 I did not take the phone calls.

 can't recall his attorney. It wasn't Rich. It was Dana Feinberg, and there was another guy that was in Virginia, and I had a conversation with him.

12:04:48 Q Was the conversation with one of Mr. Padhye's attorneys?

A Yes, sir.

Q What was the subject matter of that communication?

12:04:58 A I think it was a meet and confer, maybe, but no details of the case other than what was submitted in my answer were discussed.

Q So other than that particular conversation, have you had any other

12:05:14 conversations with counsel for Mr. Padhye, Ms. Bridges or Ms. Sana?

A No, sir.

(Plaintiff's Exhibit 21 was marked for identification.)

12:05:26 BY MR. SINGH:

Q Take a look at what's being marked as Exhibit 21.

(Witness reviewing document.)

Do you know what is marked as Exhibit

12:06:03 21?

A Yes.
Q What is Exhibit 21?
A That was information provided to me by Sameer about Taycann Wellness.
12:06:13 Q Was this a PowerPoint presentation?
A I think so. It's either PowerPoint or just a PDF.
Q Did you draft this?
A No, sir.
12:06:23 Q Were you involved with the creation of any of the content within Exhibit 21?
A Creation, no, not that I recall.
Q Is it your recollection that Mr. Padhye sent this to you?
12:06:42 A Yes.
Q Did you discuss this presentation -- strike that -- this exhibit with anyone other than Mr. Padhye?
A No. And this is the source material
12:06:54 for creating the text on the multifold website mock up, et cetera, to the best of my recollection.
Q Generally you would use this PDF to inform the other materials you were asked to
12:07:28 prepare?

A Yes. Sameer would provide the text, and the information, and I would lay it out in the document using his text and his information.

12:07:41 Q There's a slide in here that's titled "Security and Compliance." It's about four pages from the back. Do you see that?

A Yes.

Q The second bullet says Regulatory

12:08:08 Compliance, and it says, "Managed service providers adhere to strict industry regulations such as HIPAA, and HITECH, relieving healthcare providers of compliance-related burdens and potential legal risks." Do you see that?

12:08:25 A Yes.

Q Did you draft that content?

A No.

Q Did Mr. Padhye provide that to you?

A Yes.

12:08:32 Q Did you discuss this content with Mr. Padhye?

A I think I asked what HITECH was. Before he provided me with that information, I wasn't aware what HITECH was, and I think he told

12:08:44 me. But beyond that I heard of HIPAA laws in pop